# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 12, 2015 Session

## STATE OF TENNESSEE v. DENNIS ALLEN RAYFIELD

**Appeal from the Circuit Court for Wayne County**
**No. 15198   Jim T. Hamilton, Judge**

---

**No. M2013-02167-CCA-R3-CD – Filed September 28, 2015**

---

The Defendant, Dennis Allen Rayfield, was convicted of first degree murder by a Wayne County Circuit Court jury. *See* T.C.A. § 39-13-202 (2014). He was sentenced to life in prison. On appeal, he contends that (1) the evidence is insufficient to support the conviction, (2) the trial court erred in allowing the State to call a witness for the sole purpose of impeaching him, (3) the trial court erred in failing to dismiss the alternate jurors at the close of the proof, and (4) the trial court erred in permitting the sequestered jurors to have their cell phones in their possession during the trial. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Michael L. Freeman, Nashville, Tennessee, for the appellant, Dennis Allen Rayfield.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; T. Michael Bottoms, District Attorney General; Joel Douglas Dicus and Brent A. Cooper, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's conviction relates to the homicide of his twenty-six-year-old wife, Julie Rayfield. At the trial, the State presented evidence that that the Defendant had moved out of the marital home about six months before the deceased victim was found in her home on Sunday, March 18, 2012. The victim died from a gunshot wound to the head. The Defendant and the victim had a four-year-old son who was alone elsewhere in the home at the time of the shooting. The victim had retained an attorney to assist her with divorce proceedings, and in the days before her death, her attorney prepared pleadings to initiate a divorce based upon irreconcilable differences.

Wayne County Sheriff's Lieutenant Donnie Carroll testified that while he was on patrol on March 18, 2012, he saw a truck in the parking lot of Mount Hope United Methodist Church around 9:18 p.m. He "ran" the license plate number and determined the truck was registered to the victim. Other evidence established that the Defendant drove the truck. Lieutenant Carroll did not see anyone around the truck. He said that by traveling through a field, the victim's house was about one-fourth of one mile from the church.

Lieutenant Carroll testified that he had worked an incident involving a vehicle and a deer at 8:14 p.m. on March 18. He said he only called for identifying information for one license plate number that night. He initially stated that he did not go home for dinner that night, but after he was asked about GPS logs from his patrol car showing he had been parked near his house for about five minutes, he conceded the possibility he had gone home. He said his home was seven to eight minutes from Mount Hope United Methodist Church. He acknowledged the GPS information showing he had driven more than sixty miles per hour to the church after leaving his house and agreed he slowed to around thirty-one miles per hour when he was near the church. Lieutenant Carroll said that the victim had been his good friend and that he knew her family.

James Turnbow, the Wayne County E-911 director, identified a documentary record of Lieutenant Carroll's radio call regarding Lieutenant Carroll's sighting of a truck at Mount Hope United Methodist Church on March 18, 2012. Mr. Turnbow testified that according to the document, Lieutenant Carroll requested a registration check for a license tag, which other evidence showed had the same license plate number as the truck the Defendant drove. Mr. Turnbow identified an audio recording of Lieutenant Carroll's radio call requesting the registration information, and the recording was played for the jury. Mr. Turnbow said the records about which he had testified could not be edited without generating a "paper trail." He said the records had not been edited.

The victim's grandmother testified that she lived across the driveway from the victim. She said the victim and the victim's four-year-old son had been at the grandmother's house until about 7:45 p.m. on March 18, 2012. The victim's grandmother testified that the victim's son had a dog that barked a lot around strangers but should have been familiar with the Defendant. She said she went to bed around 10:00 p.m. She slept in her living room, and she could see the victim's house from her living room window. She did not see anything unusual at the victim's house or hear barking, although she awoke during the night and noticed the victim's porch light was not illuminated, which she said was unusual.

The victim's grandmother said that her usual practice was to go to the victim's house around 7:15 a.m. to help with the victim's son while the victim prepared for work. On March 19, the victim's grandmother went to the victim's house, but received no answer when she knocked. She went inside the house and found the deceased victim in a bathroom and the victim's son asleep in the master bedroom.

The victim's grandmother testified that a barrel that had previously been behind the victim's house was in front of the house below double windows. A window screen, which she had never seen previously, was on the ground. She said the front storm door was ajar and the door was unlocked, although the victim normally locked the door's deadbolt. She said that inside the house, a loveseat had been moved away from the window below which the barrel had been placed outside.

When shown her telephone records, reflecting a call to the Defendant's cell phone on the morning of March 19, 2012, the victim's grandmother testified that if she called the Defendant that day, it had been unintentional. She said that after she found the deceased victim, she had tried to call family members using a list of telephone numbers the victim had made for her, that the Defendant's name and number were on it, and that she "could have misthought."

Police officers and emergency medical personnel responded to the scene after the victim's grandmother called 9-1-1. At the scene, Lieutenant Carroll reported to Investigator Kenneth Martin and Sheriff Ric Wilson about having seen the Defendant's truck in the church parking lot the previous night.

Investigator Kenneth Martin testified that no spent cartridges were recovered at the scene. He said the police observed no signs of a struggle in the house. He said he later went to the Lawrence County jail, where he observed the Defendant shaking and shivering uncontrollably. The Defendant agreed to go to Wayne County for questioning.

Investigator Martin testified that he interviewed the Defendant in Wayne County. He said the Defendant continued to shake and shiver. He said that the Defendant recalled "rock climbing" with a friend and going to the friend's house on Sunday, March 18, but that the Defendant could not recall what happened after he left the friend's house. Investigator Martin said the Defendant never asked about the victim, his son, or what happened. He said the Defendant did not mention receiving a telephone call from a member of the victim's family stating that the victim was dead. He said that when he told the Defendant that the truck the Defendant drove had been seen at the church, the Defendant declined to answer further questions.

Investigator Martin testified that the Defendant was arrested, at which time the Defendant's clothes were collected, and search warrants were executed for the truck and the Defendant's mother's house, where the Defendant lived. The police recovered a Cricket .22 caliber bolt-action weapon and a .22 caliber Ruger from the Defendant's bedroom at his mother's house. Several rounds of .22 caliber ammunition were also recovered from the house. The police recovered ammunition of various calibers, including .22 caliber ammunition, from the truck.

Eric Rayfield testified that he was a Lawrence County correctional officer. He said his sister, Pamela Rayfield, called him on the morning of March 19, 2012, and asked him to meet the Defendant and her at the Lawrence County Sheriff's Department with "no questions asked." He said that when he arrived, he spoke with the Defendant. Officer Rayfield stated, "He said that he felt like he was caught in a dream and that his wife was dead." He acknowledged that in a written statement he gave a few days after the incident, he stated that when he asked the Defendant what was going on, the Defendant responded "that he thought he was dreaming that his wife, Julie, was dead. But the more he thought, and sobered up, the more he was not sure if it was a dream and wanted to turn himself in and find out at that point." At the time of his trial testimony, Officer Rayfield did not recall the Defendant's saying he wanted to "turn himself in." Officer Rayfield said the term referred to someone who came voluntarily to the sheriff's department but did not refer to a person who came to report a crime.

Lawrence County Sheriff's Department Chief Deputy Willie Anthony Crouch testified that on March 19, 2012, he was at work when Officer Rayfield stated that Officer Rayfield's sister and the Defendant were in the lobby. Deputy Crouch stated that Officer Rayfield said the Defendant thought he had hurt or killed someone and was there to "turn himself in." Deputy Crouch said that in his experience, the terminology "turn himself in" meant the person was there for questioning but did not indicate the person wanted to report a crime in which the person was uninvolved. Deputy Crouch conceded the possibility that the term might refer to a person who was trying to learn the facts of a situation.

Lawrence County Sheriff's Department Captain Adam Brewer testified that he saw Chief Deputy Crouch in the sheriff's department parking lot on March 19, 2012. He stated that Chief Deputy Crouch related, "[T]here is a man in the lobby that had a dream that he had killed his wife. And that, the more he sobered up, the more the dream seemed a reality." He acknowledged that he thought Chief Deputy Crouch had spoken with the man's uncle, rather than the man.

Captain Brewer testified that he waited in a Lawrence County interview room with the Defendant until Wayne County authorities arrived to transport the Defendant to Wayne County. Captain Brewer said the Defendant did not appear to be intoxicated or smell of alcohol.

The Defendant's mother, Pamela Rayfield, testified that she did not recall when the Defendant came home on the evening of Sunday, March 18. She said that she was asleep on the couch and was not wearing her glasses but that she woke when he came home. She said it was possible it was midnight or later. She said that on the morning of March 19, she heard the Defendant's cell phone ring a couple of times. She said the Defendant told her that morning that something had happened to the victim and that he wanted to go to the sheriff's department.

Ms. Rayfield testified that she had been confused and intimidated when she gave a statement to the police in which she stated that the Defendant told her at her house on the morning of March 19 that "he thought he was dreaming and can't wake up, and he thought Julie was dead[.]" She later said she did not know when he said he told her he was dreaming and thought the victim was dead. She acknowledged that in her preliminary hearing testimony, she said the Defendant stated, "I think I'm dreaming and can't wake up, Julie is dead," and that he wanted to go to the sheriff's department. Ms. Rayfield later testified that she felt intimidated by the prosecutor and had "jumbled" things because she could not remember the Defendant's exact words. She recalled, though, the Defendant's stating at some point that he was dreaming.

Ms. Rayfield testified that when she was at the sheriff's department with the Defendant on March 19, she asked a couple of times what had happened to the victim or if the victim was dead. She said no one would give them any information.

Ms. Rayfield testified that the Defendant was a good father but acknowledged he had a wage garnishment for child support. She said the Defendant liked to hunt.

Carl Alexander, a dog handler and expert in tracking and trailing, testified that his dogs performed searches at the victim's house on March 24, 2012. Relative to the search he and his certified purebreed bloodhound Zuke conducted, he said Zuke was given a "scent item," which other evidence established was the Defendant's clothing. He said that after being exposed to the scent item, Zuke went immediately to the front porch and to the area near the white barrel and the porch steps. He said Zuke then ran along a one-fourth of one mile trail, which ended in the Mount Hope United Methodist Church parking lot.

Mika Davis testified that he and the Defendant went "rock crawling" in Mr. Davis's four-wheel-drive truck on Sunday, March 18, 2012. He said that they left his house at 6:00 a.m., that they returned that evening, and that the Defendant left Mr. Davis's house around 8:10 or 8:15 p.m. He identified a photograph of the truck the Defendant drove, which other evidence established was the truck that Lieutenant Carroll saw parked at Mount Hope United Methodist Church later that evening. Mr. Davis said that when the Defendant left, the Defendant drove toward Highway 13 South and that the victim lived north of his house. Mr. Davis testified that although he and the Defendant drank beer during the day, he did not know how many beers the Defendant drank. He characterized the Defendant as a heavy drinker but did not think the Defendant was "drunk" that day. He sent text messages to the Defendant that night to see if the Defendant reached home safely but did not receive a response until around 10:00 a.m. the following day. He said that because the Defendant had been drinking on March 18, he asked the Defendant to spend the night at Mr. Davis's house. Mr. Davis said the Defendant preferred to go home because the Defendant had to prepare for work-related travel the next day.

Mr. Davis testified that he saw the Defendant's employer's service truck at a convenience market around 5:00 a.m. on March 19, 2012. Mr. Davis did not see the Defendant with the crew.

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Steve Scott, an expert in firearms identification, testified that both of the firearms found at the Defendant's mother's house were in working order. He said that the bullet that was recovered from the victim's body during the autopsy was .22 caliber but that it was deformed to the extent he could not make a more specific identification or determine if it had been fired from either of the weapons recovered from the Defendant's mother's house. He said the bullet was consistent with .22 caliber ammunition recovered from the console of the truck the Defendant drove and the Defendant's mother's house. He acknowledged that the type of .22 caliber bullets recovered from the truck and the house was common. He said this type of ammunition was more commonly used for target shooting than hunting.

The victim's mother testified that she had paid the victim's attorney's fees for the divorce the Thursday or Friday before the victim's death. The victim's mother said that she spoke to the victim during the weekend and that the victim did not say she had changed her mind about the divorce. She acknowledged she had not wanted the victim to date the Defendant at first but said she had paid for the wedding. She said the Defendant's drinking became worse during the marriage.

The victim's attorney testified that the victim had hired him to represent her in divorce proceedings and that the victim's mother hired him to obtain guardianship of the Defendant and the victim's son after the victim's death. The attorney said that against his advice, the victim had insisted upon calculation of the Defendant's child support obligation after the divorce at a much lower rate than provided by the child support guidelines. The attorney said the Defendant and the victim's tax return reflected the Defendant's monthly income as $2946.66 and the victim's monthly income as $1560. The attorney said the victim also insisted upon assuming most of the marital debt and had allowed the Defendant to keep the personal property he wanted. The attorney said the victim was in an abusive relationship. He said that he recommended to the victim that she obtain an order of protection against the Defendant but that she thought an order of protection would exacerbate the situation. The attorney said the victim was supposed to meet with the Defendant about signing the divorce papers on March 17 or 18, 2012. The attorney said he was concerned, based upon the information the victim had given him, about the victim's presenting the paperwork to the Defendant. He said, however, that the victim felt comfortable doing so and that she thought the Defendant would sign the papers and be happy to have her out of his life. The victim's attorney testified that the victim had been scheduled to return to his office with the signed documents on Monday, March 19, and that he had anticipated filing them the next day.

Alexandria Pope, the victim's friend and "cousin by marriage," testified that she had been aware of the Defendant and the victim's marital problems before they separated. She recalled that about a year before the victim's death, the victim and the victim's son came to Ms. Pope's house unannounced. She said the victim cried and was hyperventilating. After the victim calmed herself, she showed Ms. Pope a handprint on the left side of her face in her neck area.

Ms. Pope testified that on May 1, 2011, she and the victim were at a party. She said the victim continued receiving cell phone calls and having short conversations. Ms. Pope said that she could hear the Defendant's voice "hollering" and that the victim was irritated that he continued calling. She said the victim eventually left but returned about forty-five minutes later. After the victim returned, she showed Ms. Pope a round red mark about the size of a baseball on her right chest.

Ms. Pope testified that at 10:00 p.m. on March 11, 2012, about one week before the victim's death, she saw the truck the Defendant drove on Venable Road. She said the area was rural, the road was a dead end, and the victim's parents lived there. She said that the Defendant turned and drove toward the victim's house and that he had "no reason" to be there. Ms. Pope said that she called the victim and told her what she had

seen and that the victim was scared and asked Ms. Pope to stay on the phone with her. Ms. Pope said she stayed on the phone with the victim for about one hour.

Ms. Pope acknowledged that she did not approve of the Defendant's lifestyle. She said she and her husband had not socialized with the Defendant because he drank heavily.

Amanda Dixon testified that she saw the victim on the evening of March 18, 2012, when their children had a playdate. Her impression, after her conversation with the victim that night, was that the Defendant was unhappy about the amount of child support the victim sought. She had understood that the victim was seeking less child support than allowed by the child support guidelines. Ms. Dixon said she had been around the Defendant and the victim during their marriage and that the couple did not fight, although the victim had told her about the arguments the couple had when Ms. Dixon was not present. Ms. Dixon said the topics of the Defendant and the victim's arguments had been typical marital disagreements.

Amanda Isbell testified that she had been dating the Defendant for about one month on March 18, 2012. She said the Defendant was upset because the victim wanted the same amount of child support the Defendant's former wife received for their two children.

Ms. Isbell testified that she received text messages from the Defendant on the weekend of the victim's death that were uncharacteristic of their typical conversations. She said that on March 16, 2012, the Defendant stated in a text message that he was looking for answers in life and mentioned his "[s]oon to be ex-wife." She said that on March 18, the Defendant was supposed to come to her house at 8:30 p.m. She said that she received a text message around 8:00 p.m. stating he was on his way but that he never arrived. She sent him a text message at 8:34 p.m. and inquired if he was coming, but she did not receive a response. She sent a text message at 7:41 a.m. on March 19 asking if the Defendant was okay, and he responded quickly that he was fine. She said that she asked what happened and that he responded he was busy and would talk to her later. She said she had not heard from him since she received this message.

Ms. Isbell testified that the Defendant's work involved overnight travel from Sunday night or early Monday morning until Thursday or Friday. She said her house was about fifteen minutes from the Defendant's mother's house and required driving through Lawrenceburg. She agreed that a person who was "a little drunk" would be unwise to drive through Lawrenceburg.

Dr. Amy Hawes, an expert in forensic pathology, performed the autopsy of the victim. She testified that the victim's cause of death was a gunshot wound to the left eye and that the manner of death was homicide. She was unable to determine how long the victim had been dead and was unable to determine from the examination the type of weapon used.

Malia Catherine Brazier, the Defendant's previous wife, testified for the defense that she and the Defendant had two children together. She characterized the Defendant as a good, involved father who saw his children at least once every weekend, but she acknowledged he had been delinquent in his child support payments more frequently than he had been current.

Ms. Brazier testified that she had felt intimidated by Investigator Carroll's repeated attempts to interview her relative to this case. She perceived he had threatened to involve the Department of Human Services (DHS) if she did not cooperate. She agreed Investigator Carroll had mentioned involving DHS to help him interview Ms. Brazier's children but said she thought he was threatening to have DHS take away her children. She said that Investigator Carroll had been persistent about wanting to question her and that she thought he wanted to find something from the Defendant's past to use against him. She agreed Investigator Carroll later apologized.

Ms. Braizer testified that the Defendant had not been abusive during their marriage and that his drinking had not been problematic. She said she was never concerned about his being at home with her children and that she did not feel threatened by him.

The Defendant testified that he and the victim began dating in 2005. He said he had not wanted a divorce. He thought the reasons for the divorce were his out-of-town work, his not being around, and the victim's family's influence. He said the victim and he argued at times. He said that the victim had hinted about a divorce and that she had mentioned hiring a lawyer but that they had not discussed it. He said that they never discussed divorce papers and that he had been unaware they had been drafted. He acknowledged drinking beer daily by the time of the separation but said his drinking was not part of the marital problem.

The Defendant testified that he had difficulty remaining current in his child support obligations to his first wife. He said he paid about $600 per month to his first wife. He said that when he learned he might have to pay about that much to the victim, he was a little "upset," but it did not "bother" him.

The Defendant testified that he moved out of the marital home after the victim's family accused him of whipping his son with a belt. He said he had whipped the child and that if he had bruised the child, he did not want the bruise to be misinterpreted. He called the sheriff's department and reported the family's allegation, and he was not charged. He said that he would never hit his son hard enough to bruise him and that he had never hit the victim or caused a bruise on her chest or neck.

The Defendant testified that two days after the victim's death, the victim's family obtained a restraining order. He said he was unable to attend the victim's funeral or contact his son.

Regarding the text messages he exchanged with Ms. Isbell on March 16, 2012, the Defendant testified that he was probably depressed when he said he was looking for answers in life. He said he was upset and sad about the divorce but was not angry.

The Defendant testified that he spent the night of March 17, 2012, at Mika Davis's house because they were going rock crawling early the next morning. He said that he and Mr. Davis returned to Mr. Davis's house from rock crawling around 8:00 p.m. on March 18 and that he left about twenty to thirty minutes later. He said he had planned to see Ms. Isbell later that evening. He acknowledged a text message he sent her at 8:00 p.m. that night stated he was on his way. He said that he did not respond to a text message she sent asking him to call her. He said that ultimately, he did not go to Ms. Isbell's house because he was too intoxicated to drive across town. He said he changed his mind about going to her house while he was driving after he left Mr. Davis's house. He said that the drive from Mr. Davis's house to his mother's house took about one and one-half hours and that he probably drove slower when he was intoxicated. He thought he might have stopped on the side of the road to urinate. He said he arrived at his mother's house at 10:00 p.m. and went to bed.

The Defendant testified that he drank eighteen beers during the day of March 18, 2012, beginning at 8:00 a.m. He said that he bought twelve additional beers after they left the rock crawling location. He began drinking them after he purchased them, although he did not recall how many he drank.

The Defendant testified that his cell phone woke him on March 19, 2012. He said he did not answer but recognized the number as the victim's grandmother's. He said he returned the call at 7:30 a.m. He said the victim's grandmother stated that the victim was dead and that he had killed her. He said that after the call, he expressed his concern to his mother and asked if they could go to the sheriff's department.

When shown his cell phone records for March 19, 2012, the Defendant did not recall having made a call at 6:05 a.m. or having received a call before the call from the victim's grandmother.

The Defendant testified that they met his uncle, Eric Rayfield, at the sheriff's department and that he told his uncle he needed to talk to someone. He did not recall whether his uncle asked for an explanation. He did not know why his uncle would claim the Defendant had stated that he felt like he was dreaming the victim was dead and that after he "sobered up" and thought about it, he wanted to turn himself in. The Defendant did not recall saying this. He said that when they were inside the sheriff's department, he told his mother he felt like this was a dream and he could not believe he was not waking. He acknowledged he had been upset and his memory might not be accurate.

The Defendant testified that he was not given any information at the sheriff's department about what was happening, that he was handcuffed and read his rights, and that he did not find out the victim had been shot until a few days later. He acknowledged he had not asked if the victim was dead or if his son was okay.

When shown a photograph of the truck he drove around the time of the victim's death, he said he knew no reason why it would have been parked in the Mount Hope United Methodist Church parking lot on March 18, 2012, at 9:18 p.m. He said that at the same time, he would have been driving the truck from Mr. Davis's house to his mother's house. He said that he did not drive to Mount Hope Road on the night of March 18 and that his route would not have taken him there. He said the officer who testified about seeing the truck and the truck's license plate number was wrong, notwithstanding the Defendant's having heard the recording of the officer's radio transmission about the truck and tag that was played during the State's case-in-chief. When shown a photograph of the marital home, he denied he had gone there on the night of March 18 and said he had last been there about one month before the victim's death. He denied that he had been to Venable Road the week before the victim's death and said the person who claimed to have seen him was incorrect.

The Defendant testified that he had a shotgun and a rifle in his truck when he went rock crawling but denied that he had a .22 caliber pistol or rifle with him. He recognized the two rifles previously introduced as exhibits as his. He said he stored ammunition in his truck because he liked to hunt.

After receiving the proof, the jury found the Defendant guilty of first degree premeditated murder, and he was sentenced to life in prison. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction. He notes the proof of his intoxication, the police's failure to determine that any of the .22 caliber weapons recovered fired the fatal shot, Lieutenant Carroll's unprompted patrol in the area of Mount Hope United Methodist Church on March 18, the proof the victim had gunshot residue on her hands but he did not, and the failure of the police to preserve the crime scene. The State responds that the evidence is sufficient and that the Defendant is not entitled to relief.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not

necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

We note, first, the Defendant's failure to cite to the record in his statement of the facts and in his argument relative to the sufficiency of the evidence. Tennessee Rule of Appellate Procedure 27(a)(6) requires that an appellate brief include "[a] statement of facts, setting forth the facts relevant to the issues presented for review *with appropriate references to the record*[.]" (Emphasis added.) Likewise, Rule 27(a)(7) provides that the argument section of a brief shall set forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and *appropriate references to the record (which may be quoted verbatim) relied on*[.]" T.R.A.P. 27(a)(7) (emphasis added). The rules of this court provide, "Issues which are not supported by argument, citation to authorities, or *appropriate references to the record* will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b) (emphasis added).

Our review of the Defendant's sufficiency of the evidence issue is frustrated by his failure to include citations to the record. We note, particularly, the Defendant's failure to provide any citation for his statement the proof showed gunshot residue on the victim's hands, but not the Defendant's hands. Our review of the record has not revealed any evidence that gunshot residue was collected and that testing occurred. To the extent that the Defendant's argument is otherwise supported by the facts in the record, we will consider it despite his failure to cite to the record. We caution the Defendant, though, that compliance with the Rules of Appellate Procedure and the rules of this court is expected and that failure to do so risks waiver of the affected issue.

Viewed in the light most favorable to the State, the evidence shows that the Defendant did not want a divorce and was upset about the amount of child support he would be required to pay. The Defendant had existing problems with remaining current in his child support obligations for his children from his first marriage. Although the victim's attorney thought, based upon the information he had been provided, that the

-13-

victim should seek an order of protection against the Defendant and that the victim should not personally present the divorce paperwork to the Defendant, the victim planned to meet with the Defendant on March 17 or 18 and provide him with the documents. The victim was found dead from a gunshot wound to the head on March 19.

Despite having made plans to visit Ms. Isbell on the evening of March 18, 2012, the Defendant never appeared at her house and failed to communicate with her about his change in plans. The truck the Defendant drove was seen at Mount Hope United Methodist Church around 9:18 p.m., and no person was seen near the truck. On March 24, a bloodhound tracked the Defendant's scent from the front steps of the victim's home to the same location in the Mount Hope United Methodist Church parking lot where the truck the Defendant drove was parked on the night of March 18.

Although the bullet removed from the victim's body was too damaged to be matched through ballistics testing to a particular weapon, .22 caliber weapons were found in the Defendant's mother's home, and .22 caliber ammunition was recovered from the truck the Defendant drove and the Defendant's mother's house. The Defendant acknowledged owning .22 caliber weapons and admitted he had two .22 caliber weapons with him when he went rock crawling on March 18, 2012. The bullet removed during the autopsy was consistent with the caliber and brand of ammunition recovered from the truck the Defendant drove.

The Defendant offered proof of his intoxication on the night of the offense, and despite his contention to the contrary, the record reflects that the trial court instructed the jury on voluntary intoxication. Although voluntary intoxication is not a defense to a crime, evidence of intoxication is relevant to determining whether a defendant was capable of forming the required mental state for the charged offense. *See* T.C.A. § 39-11-503 (2014). "The weight to be given the evidence and the determination of whether the voluntary intoxication negated the culpable mental elements were matters for the jury." *State v. Morris*, 24 S.W.3d 788, 796 (Tenn. 2000).

The Defendant testified that he drank eighteen beers throughout the day on March 18, 2012, and that he bought twelve additional beers and continued drinking in the evening. In his brief, the Defendant notes his testimony that he was afraid he was too intoxicated to drive to Ms. Isbell's house after he left Mr. Davis's house on March 18 and that he went to his mother's house instead. The Defendant's position at the trial was that he did not commit the offense, not that he was too intoxicated to have premeditated the killing, and he did not offer any proof that his level of intoxication would have rendered him incapable of premeditation. The evidence shows that the Defendant drank at least eighteen and no more than thirty beers, albeit over a period of about sixteen hours. The

-14-

Defendant testified that he did not want to drive through Lawrenceburg to Ms. Isbell's house due to his intoxication. Mr. Davis testified that although he had asked the Defendant if the Defendant wanted to spend the night of March 18 at Mr. Davis's house due to the Defendant's alcohol consumption, the Defendant "seemed fine to drive."

From the proof, the jury could infer that the Defendant traveled about one-fourth of one mile on foot from Mount Hope United Methodist Church to the victim's house, where he placed a barrel under a window, removed the screen, entered the house through the open window, shot the victim in the head with a .22 caliber weapon, left through the front door, went to his mother's house, and waited until the body had been discovered the next day before initiating any contact with the authorities. The Defendant's actions are inconsistent with a conclusion he was incapable, due to intoxication, of premeditating the victim's killing. The evidence is sufficient to show the Defendant intentionally and with premeditation killed the victim. He is not entitled to relief on this basis.

## II

### Testimony of Eric Rayfield

The Defendant contends that the trial court erred in permitting the State to offer the testimony of the Defendant's uncle, Eric Rayfield, for the sole purpose of impeaching the testimony relative to a statement the Defendant made to Mr. Rayfield at the Lawrence County Sheriff's Department on the morning of March 19, 2012. The Defendant contends that despite the fact Mr. Rayfield had previously repudiated Mr. Rayfield's prior written statement in his preliminary hearing testimony, the State called Mr. Rayfield and was permitted to impeach his trial testimony with evidence of the written statement as well as Mr. Rayfield's oral statements to other law enforcement officers about what the Defendant said to Mr. Rayfield. The State counters that the trial court did not abuse its discretion in denying the Defendant's motion for a mistrial on this basis.

As we have stated previously, Mr. Rayfield met the Defendant and the Defendant's mother at the sheriff's department on the morning of March 19, 2012, at the Defendant's mother's request. Mr. Rayfield's undated written statement, which he testified he prepared "a couple of days after" Monday, March 19, 2012, states in pertinent part:

> Dennis Allen Rayfield said to me that he thought that he was dreaming that his wife Julie was dead but the more he thought and sobered up the more he was not sure it was a dream and wanted to turn himself in and find out[.]

At the preliminary hearing, Mr. Rayfield testified relative to when he first spoke with the Defendant at the sheriff's department, "I asked him why they wanted me to meet, and he told me he felt like he was caught in a bad dream, and that his wife was dead." After the prosecutor at the preliminary hearing refreshed Mr. Rayfield's recollection with the prior written statement, which the prosecutor had Mr. Rayfield read, Mr. Rayfield acknowledged that the statement reflected "[p]retty much" what the Defendant told Mr. Rayfield on the morning of March 19. Mr. Rayfield said the Defendant had not said anything about receiving a telephone call in which someone told him the victim was dead, but Mr. Rayfield said he had cut off the Defendant because Mr. Rayfield did not want to know anything else about the situation. Mr. Rayfield was not questioned at the preliminary hearing about the portion of the written statement in which he said the Defendant wanted to "turn himself in," although this information was part of what he read aloud when the prosecutor refreshed Mr. Rayfield's recollection with the prior written statement.

At the trial, the State called Mr. Rayfield as a witness during its case-in-chief. Mr. Rayfield testified that on March 19, 2012, the Defendant's mother called and asked him to meet her and the Defendant at the sheriff's department with "no questions asked." He said she did not provide an explanation for her request. The prosecutor asked what the Defendant told Mr. Rayfield when the Defendant arrived, and Mr. Rayfield responded, "He said that he felt like he was caught in a dream and that his wife was dead." Mr. Rayfield agreed that his recollection of the details of the events when he first spoke with his nephew might have been more clear when he prepared a written statement at Chief Deputy Crouch's request a few days after March 19. When the prosecutor asked him to read a portion of the statement, Mr. Rayfield said:

> I asked okay, what's up? And her son, Dennis Allen Rayfield, said to me that he . . . thought that he was dreaming that his wife, Julie, was dead. But the more he thought, and sobered up, the more he was not sure it was a dream and wanted to turn himself in and find out at that point.

The statement was received as an exhibit. The prosecutor then questioned Mr. Rayfield about the events that occurred later at the sheriff's department.

On cross-examination, defense counsel asked Mr. Rayfield to repeat his recollection of what the Defendant first said to him at the sheriff's department. Mr. Rayfield said, "This is a year later. I'm really not remembering too well. But he basically told me that he had felt like he was caught in a bad dream and that his wife, Julie, was dead." Mr. Rayfield said that to the best of his recollection, his testimony at the preliminary hearing had been "pretty consistent" with his current testimony. At

defense counsel's request, Mr. Rayfield read the relevant portion of the written statement a second time. Mr. Rayfield agreed the statement was "pretty much consistent" with his trial and preliminary hearing testimony. He said his impression of the Defendant's statement was that the Defendant "thought he was caught in a bad dream."

On redirect examination, the following occurred:

Q. Well, [defense counsel] paints your statements as being consistent and I guess that's up for the jury to decide. But I want to point out that, what you said at the preliminary hearing and what you said today is not exactly what you said to the statements you wrote . . . two days . . . after, which said, "He said to me that he thought he was dreaming that his wife Julie was dead. But the more he thought, and sobered up, the more he was not sure it was a dream and wanted to turn himself in." Those are your words, written two days after it happened, correct?

A. That is correct, sir.

The prosecutor and defense counsel continued questioning Mr. Rayfield, but their questioning focused primarily on his use and the meaning of the phrase "turn himself in" in reference to the Defendant's appearance at the sheriff's department.

Defense counsel did not object to the State's calling Mr. Rayfield as a witness, nor did counsel make any contemporaneous objections to the State's questioning of Mr. Rayfield.

After Mr. Rayfield testified, the State called Chief Deputy Crouch and Captain Brewer as witnesses. The prosecutor asked Chief Deputy Crouch about the events of March 19, 2012, and Chief Deputy Crouch related that Mr. Rayfield approached him in the lobby of the sheriff's department and asked to speak with him. When the prosecutor inquired what Mr. Rayfield told Chief Deputy Crouch, the Defendant objected on the basis the answer would be hearsay. The prosecutor said the question was asked to elicit "specific things that Mr. Rayfield . . . said for impeachment purposes of Eric Rayfield . . . [b]ased on his testimony about turning yourself in being a term of law enforcement officers." The trial court overruled the objection. Chief Deputy Crouch then testified that Mr. Rayfield said the Defendant thought he had hurt or killed someone and was there to "turn himself in." Chief Deputy Crouch said that in his thirty years of law enforcement experience, the phrase "turn himself in" meant the person was there for questioning. When the prosecutor asked if the phrase could refer to a person's presence to report a crime in which the person was uninvolved, the defense objected on the basis

the question had been asked and answered. The court overruled the objection. Chief Deputy Crouch then testified that in his experience, the phrase "turn himself in" did not refer to a person who was reporting a crime in which the person was uninvolved. On cross-examination, Chief Deputy Crouch conceded the "[p]ossibility" that the phrase could refer to a person who was trying to learn the facts of a situation.

During Captain Brewer's testimony, he said Chief Deputy Crouch told him in the parking lot of the sheriff's department, "Well, there's a guy in the lobby that says that he had a dream that he may have killed his wife." The Defendant made a hearsay objection, and the court sustained the objection and instructed the prosecutor to rephrase the question. The State did not ask the question again on direct examination. Captain Brewer testified that he showed Chief Deputy Crouch a photograph of a person who was a person of interest in the possible homicide case and that Chief Deputy Crouch said the person in the photograph was the person in the lobby. Captain Brewer then testified about his advising the Defendant of his *Miranda* rights and their engaging in small talk while waiting for Wayne County authorities to arrive. Captain Brewer said he did not question the Defendant.

On cross-examination, defense counsel asked Captain Brewer how he connected the information between the photograph of the person of interest and the person in the lobby. Captain Brewer said Chief Deputy Crouch did not tell him the identity of the person in the lobby but did tell him the person was concerned about the death of a spouse. Captain Brewer said he connected the person of interest with the person in the lobby based upon this information. The defense questioned Captain Brewer further about the events after he approached Mr. Rayfield in the lobby.

On redirect examination, the prosecutor asked, "Captain, now that [defense counsel has] asked you what caused you to connect the dots between the driver's license picture that you had and the person in the lobby; what did [Chief Deputy] Crouch tell you about that person in the lobby?" Defense counsel objected on the basis of hearsay, and the trial court overruled the objection. Captain Brewer testified, "He said that there was a man in the lobby that had had a dream that he had killed his wife. And that, the more that he had sobered up, the more the dream seemed a reality." The prosecutor asked if the statement was the reason he thought the person in the lobby might be the person of interest, and Captain Brewer agreed that it was. He said the statement was the reason he showed Chief Deputy Crouch the photograph.

On recross-examination, defense counsel asked questions to clarify that the statement about the dream attributed to the Defendant had been relayed from the Defendant to Mr. Rayfield to Chief Deputy Crouch to Captain Brewer.

The day after Mr. Rayfield, Chief Deputy Crouch, and Captain Brewer testified, the Defendant filed a motion for a mistrial in which he alleged that the State's calling of Mr. Rayfield as a witness violated Tennessee Rule of Evidence 607 because the State had called Mr. Rayfield with the sole purpose of impeaching his testimony with otherwise inadmissible hearsay evidence. He complained that Chief Deputy Crouch and Captain Brewer were permitted to testify that Mr. Rayfield had stated previously that the Defendant dreamed he had killed his wife. In support of the argument Mr. Rayfield's testimony had been offered for the sole purpose of impeaching it, defense counsel noted that the State had been aware of Mr. Rayfield's preliminary hearing testimony, which counsel argued was different from the written statement Mr. Rayfield gave a few days after the relevant events. In responding to the motion for a mistrial, the prosecutor noted that the State had been aware of Mr. Rayfield's written statement, the verbal statement to Chief Deputy Crouch, and the preliminary hearing testimony, but that the State "had no idea which one he was going to stick with." The prosecutor noted, as well, that Mr. Rayfield's preliminary hearing testimony "was not even exactly like" his trial testimony. The trial court denied the motion without elaboration.

Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 607 provides, "The credibility of a witness may be attacked by any party, including the party calling the witness." The Advisory Commission Comments state, "Decisional law prohibits a lawyer from calling a witness – knowing the testimony will be adverse to the lawyer's position – solely to impeach that witness by an inconsistent statement." Rule 613 permits impeachment of a witness with a prior inconsistent statement. *See* Tenn. R. Evid. 613. A prior inconsistent statement may be used as substantive evidence. Tenn. R. Evid. 803(26). However, "a witness may not be impeached primarily for the purpose of introducing the prior inconsistent statement." Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.13[2][d] (6th ed. 2011); *see State v. Jones*, 15 S.W.3d 880, 891-92 (Tenn. Crim. App. 1999).

In previous cases involving allegations that a party offered a witness's testimony for the sole purpose of impeaching the testimony with otherwise inadmissible evidence, this court has considered whether the prior statement and the testimony were inconsistent, whether the party calling the witness was aware the witness had disavowed the previous statement, and whether evidence existed to show the witness had been called for the sole

purpose of impeachment.  *See Jones*, 15 S.W.3d at 892; *Mays v. State*, 495 S.W.2d 833, 836-37 (Tenn. Crim. App. 1972); *State v. Harold Francis Butler*, No. E2014-00631-CCA-R3-CD, 2015 WL 2233122, at *7-8 (Tenn. Crim. App. May 11, 2015), *perm. app. filed* (Tenn. July 10, 2015); *State v. Deundrick Laran Coble*, No. W2001-00039-CCA-R3-CD, 2002 WL 31259501, at *3 (Tenn. Crim. App. Aug. 30, 2002); *State v. Roy L. Payne*, No. 03C01-9202-CR-00045, 1993 WL 20116, at *1-2 (Tenn. Crim. App. Feb. 2, 1993).

The Defendant argues that at the preliminary hearing, Mr. Rayfield disavowed the prior written statement by "stat[ing] that the assertion [in the written statement relative to what the Defendant said to Mr. Rayfield at the sheriff's department] was incorrect" and stated that what he had actually been told by the Defendant was that the Defendant felt he was 'caught in a bad dream and his wife was dead.'"  Although the wording of Mr. Rayfield's preliminary hearing testimony was not exactly the same as his written statement, the general import of both was that Mr. Rayfield reported that the Defendant had said he felt like he was dreaming or like he was caught in a dream.

At the preliminary hearing, Mr. Rayfield acknowledged the contents of the written statement and said it "[p]retty much" reflected what the Defendant told him, although his preliminary hearing testimony tended to minimize the Defendant's culpability by omitting the reference to the Defendant's turning himself in.  Mr. Rayfield was not specifically asked, though, at the preliminary hearing about the portion of the written statement in which he said the Defendant wanted to "turn himself in and find out" about the victim.

At the trial, Mr. Rayfield did not disavow the accuracy of his written statement about the Defendant's desire to turn himself in.  To the extent that Mr. Rayfield addressed this portion of the written statement in his trial testimony, he explained his understanding of the phrase's meaning in law enforcement parlance.  His understanding of the meaning tended to minimize the Defendant's culpability, but it was not inconsistent with the portion of the written statement in which he said the Defendant "wanted to turn himself in and find out."

At the hearing on the motion for a new trial, the prosecutor addressed the allegation the State had called Mr. Rayfield as a pretext to impeach him with his written statement and to call Chief Deputy Crouch and Captain Brewer to impeach Mr. Rayfield's testimony with his prior statements to them.  The prosecutor stated that the State had prepared Mr. Rayfield for trial and expected him to testify a certain way but that Mr. Rayfield had been disingenuous with the State about his testimony.  The prosecutor stated that the impeachment was prompted because Mr. Rayfield's testimony

had been different than Mr. Rayfield had led the State to believe it would be, and the prosecution argued that the State was permitted to impeach its own witness pursuant to Tennessee Rule of Evidence 607.

Based upon the prosecutor's statement to the court about the State's preparing Mr. Rayfield for his trial testimony and Mr. Rayfield's deception relative to the content of his trial testimony, we conclude that the Defendant has not shown that the State was aware, when it called Mr. Rayfield as a trial witness, that Mr. Rayfield had disavowed his written statement. In the absence of such evidence, we cannot conclude that Mr. Rayfield was called as a witness as a pretext to introducing his written statement and that the testimony of Chief Deputy Crouch and Captain Brewer should not have been allowed to impeach Mr. Rayfield's testimony.

We turn to the question of whether the trial court erred in denying the Defendant's motion for a mistrial. A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State,* 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

In the present case, the Defendant has failed to establish the underlying legal errors upon which he contends the trial court should have granted a mistrial. For this reason, he cannot establish that the court abused its discretion in denying his motion for a mistrial. He is not entitled to relief on this basis.

### III

### Failure to Dismiss Alternate Jurors

The Defendant contends that the trial court erred in failing to dismiss the alternate jurors at the close of the proof and by requiring the alternate jurors to remain available until the verdict was reached. He acknowledges the court's statement at the motion for a new trial hearing that the alternate jurors were kept apart from the jurors during the deliberations, the court clerk's unsworn statement to this effect, and the court's statement that its usual practice was to require the jurors to remain available but not in the jury room until a verdict was reached. The State contends that the court's procedure, though erroneous, was harmless.

Tennessee Rule of Criminal Procedure 24(f) provides:

> (f) Additional Jurors. -- Before jury selection begins, the court may call and impanel one or more jurors in addition to the regular jury of twelve persons. The following procedures apply:
>
>> (1) Same as Regular Jurors. -- The additional jurors shall be drawn in the same manner, have the same qualifications, be subject to the same examination and challenges, take the same oath, and have the same functions, powers, facilities, and privileges as the regular jurors.
>>
>> (2) Methods of Impaneling Additional Jurors. -- The trial court may use either of the following methods to select and impanel additional jurors:
>>
>> (A) Single Entity. -- During jury selection and trial of the case, the court shall make no distinction as to which jurors are additional jurors and which jurors are regular jurors. Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number of jurors to reduce the jury to a body of twelve or such other number as the law provides. *A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict.*
>>
>> (B) Separate Entities. -- Following the selection of the jury of twelve regular jurors, the additional jurors shall be selected and impaneled as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who become unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict. *An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict.*

(Emphasis added.)

As the parties have accurately noted, the Rules of Criminal Procedure provide that alternate jurors shall be discharged once the jury retires to deliberate. The Defendant

-22-

notes that in *Patten v. State*, 426 S.W.2d 503, 506 (Tenn. 1968), the Defendant was granted a new trial because the alternate juror remained with the jury during its deliberations but was instructed not to participate in the deliberations. The Defendant argues that because no testimony was offered to show that the alternate jurors were not in the jury room during deliberations, he should be afforded relief. He has cited no authority, however, to support a conclusion that the error is presumptively prejudicial.

After the jury returned with its verdict and before the verdict was read, the court observed, "Let the record reflect that the jury has returned to the courtroom. And the alternate jurors are also here, although they have not participated in any deliberations." The record reflects that the Defendant's first objection to the trial court's deviation from the rule occurred in the amended motion for a new trial. At the hearing on the motion for a new trial, the court noted in response to defense counsel's assertion that *Patten* dictated the Defendant should receive a new trial, "I don't think that the three [alternate] jurors – it was only twelve jurors that deliberated and arrived at a verdict in this case. The three alternates weren't in there during their deliberations." Defense counsel responded, "They indicated that they were, Your Honor." The court disagreed and said the alternate jurors had been in the courtroom or a "private room." The court clerk agreed that the alternate jurors had been in a private room. Defense counsel did not offer any proof to support his assertion that the alternate jurors had been in the jury room, and no evidence supporting this conclusion appears in the record.

We conclude that although the trial court erred in failing to dismiss the alternate jurors at the appropriate time, the Defendant has not shown that they were present during the jury's deliberations or that their retention in any way affected the deliberations. The Defendant is not entitled to relief on this basis.

## IV

### Sequestered Jurors' Possession of Cell Phones During the Trial

The Defendant contends that a separation of the sequestered jury occurred because the jurors were allowed to keep their cell phones during the trial. The State responds that the jurors' cell phone access created nothing more than the possibility of separation and that the Defendant is not entitled to relief because he has not shown that the jurors were exposed to extraneous prejudicial information.

Immediately after the jury was sworn, the trial court gave its preliminary jury instructions, which included admonitions not to talk to the attorneys, the witnesses, or the Defendant. The court also provided the following instruction:

During the course of the trial, you will receive all the evidence you may properly consider to decide this case. Because of this, you should not attempt to do any research on your own, or gather any information on your own, that you think might be helpful. Do not engage in any outside reading, visit any places mentioned in this case, or try to learn about the case outside of this courtroom in any other manner.

At the end of the second day of the trial, which was the same day the jury was sworn and given the preliminary instructions, the trial court gave the following instruction:

Please remember what I told you about don't discuss this case with anyone, certainly don't discuss it among yourselves, or watch any TV accounts of this trial. I haven't seen any of the cameramen around, so I doubt there will be, but even if it is, don't watch that and don't listen to any radio accounts.

. . . .

Don't read any of the newspapers [sic] articles, regardless of where they are.

On the third day of the trial, which was the day after the jury was sworn, defense counsel stated:

Also, Your Honor, if you don't mind I want to . . . We discussed this briefly, yesterday, in chambers, I wanted to put on the record. I noticed, yesterday, as the jury was coming out as many of five of them had cellular telephones strapped to their belts. And I know the Court has sequestered the jury, has instructed them not to have contact with anyone concerning this case, has gone so far as to put them into a hotel here in town. And I wanted to lodge my objection, to the Court, allowing them to maintain possession of their cell phones while this case is proceeding.

I know the Court ruled on it yesterday, that you were not going to take their phones away from them. And if that's your decision –

The judge responded, "I'll talk to them about that." When the jurors returned to the courtroom, the judge gave the following instruction:

-24-

Ladies and gentlemen of the jury, let me caution you one more time: I know all of you – or maybe not all of you, but most of you, I guess – have one of those cell phones. I don't want you to be carrying on any conversations with anybody using those instruments while you're on this case, as a jury, that's the same as if you talked to them. Does everybody understand? I don't want to take them up.

And I'll even further instruct you that, if you should get a call on one of those machines, and you tell whoever is calling that you can't discuss anything with them. In fact, just hang up the phone. Don't talk to them.

Relative to this instruction, the record reflects, "Whereupon, jurors nod heads in the affirmative[.]"

The Defendant argues that he has established a separation and that the State failed to present any evidence to meet its burden of establishing "that nothing occurred to allow the jury to mingle with others in the community and form opinions about the case related to something other than the evidence developed at trial." The Defendant argues that he is entitled to a new trial.

Tennessee Code Annotated section 40-18-116 (2012) provides, "In all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." The purpose of the sequestration rule is to "preserve a defendant's right to a fair trial and impartial jury by protecting jurors from outside influences so that the verdict will be based only upon evidence developed at trial[.]" *State v. Bondurant*, 4 S.W.3d 662, 671 (Tenn. 1999) (citing 23A C.J.S. *Criminal Law* § 1363(a) (1989)). "[I]t is perhaps more important in the modern age, considering the pervasiveness of media coverage and publicity." *Id.* Once a defendant establishes a separation of a sequestered jury, the burden shifts to the State to show that the defendant was not prejudiced by the separation. *Bondurant*, 4 S.W.3d at 672; *Gonzalez v. State*, 593 S.W.2d 288, 291 (Tenn. 1980). A mere possibility of a separation, though, is insufficient to place the burden upon the State to show lack of prejudice. *State v. McClain*, 667 S.W.2d 64, 66 (Tenn. 1984). Rather, a defendant must show that an actual separation occurred. *Id.*

As our supreme court has noted:

[A]t common law, the sequestration rule required that jurors be physically kept together within the presence of each other without food, drink, fire or

-25-

light until a verdict was agreed upon. *Gonzales v. State*, 593 S.W.2d 288, 292 (Tenn. 1980); Annotation, *Separation of Jury in Criminal Case*, 34 A.L.R. 1115, 1117 (1925). The common law rule has been greatly relaxed, and currently, sequestration is a creature of statute. Mary Strauss, *Sequestration*, 24 Am.J.Crim. L. 63, 70 (Fall 1996). Moreover, under modern law, the test of keeping a jury "together" is not a literal one, requiring each juror to be at all times in the presence of all others. The practical needs of personal hygiene and separate rooms for sleeping, if nothing else, preclude such a literal application. The real test is whether a juror passes from the attendance and control of the court officer. *State v. Bartlett*, 137 Vt. 400, 407 A.2d 163, 166 (1979).

Although the sequestration rule is no longer literally applied, the purpose of the rule -- to preserve a defendant's right to a fair trial and impartial jury by protecting jurors from outside influences so that the verdict will be based only upon evidence developed at trial -- is perhaps more important in the modern age, considering the pervasiveness of media coverage and publicity. 23A C.J.S. *Criminal Law* § 1363(a) (1989). Many years ago, this Court emphasized that "[t]oo much strictness cannot be used to keep a jury charged with the life or liberty of a citizen, from mingling with the community during their deliberations, and this the more especially where there is any excitement for or against the prisoner." *Cochran v. State*, 26 Tenn. (7 Hum.) 544, 547 (1847).

*Bondurant*, 4 S.W.3d at 671-72.

In *State v. Smith*, 418 S.W.3d 38, 42 (Tenn. 2013), a juror communicated during the trial via a social media website with a State's witness. The court said that despite the advent of technology and the resulting increasing ease with which jurors could communicate with third parties and despite the increasing difficulty in detecting such communications, "our pre-internet precedents provide appropriate principles and procedures to address extra-judicial communications[.]" *Id.* at 47. To that end, the inquiry begins with determining "whether the trial court received reliable and admissible evidence that an extra-judicial communication between a juror and a third party occurred." *Id.* at 48. Our supreme court has said, "It is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial." *Cartwright v. State*, 80 Tenn, 620, 625 (1883) (quoted in *Gonzalez*, 593 S.W.2d at 291).

-26-

In *State v. Bondurant*, 4 S.W.3d at 670-71, the defendant presented proof that the sequestered jurors were allowed twice daily during the eight-day trial to drive their personal vehicles between their hotel and the courthouse. The defendant noted that the case had been highly publicized and had been covered by newspaper, television, and radio media outlets. *Id.* at 671. A court officer stated in an affidavit that he had no control over the jurors during their travels and that he had no knowledge of their activities and stops during their travels. *Id.* The State did not offer proof to rebut the showing of jury separation. *Id.* In rejecting the State's argument that the facts presented the possibility of a separation but not an actual separation, the supreme court was influenced by the officer's affidavit indicating his lack of knowledge and control relative to the jurors during their commutes. *Id.* at 673.

In *State v. Jackson*, 173 S.W.3d 401, 410 (Tenn. 2005), the defendant contended that the sequestered jury was separated because several jurors encountered the spouse of a deputy, a juror spoke to an unknown person at a restaurant, and a non-juror was removed from a buffet line in which the jurors were standing. The supreme court concluded, though, that the State rebutted the presumption of prejudice by presenting the testimony of all of the jurors and the deputy that they did not discuss the case with any non-jurors and with the deputy's spouse's testimony that he did not know the facts and circumstances of the case. *Jackson*, 173 S.W.3d at 410-11.

In *State v. Jeffrey D. Allen*, No. W2008-01348-CCA-R3-CD, 2009 WL 2502000, at *8-9 (Tenn. Crim. App. Aug. 17, 2009), *perm. app. denied* (Tenn. Feb. 22, 2010), the defendant contended that a separation of the sequestered jury occurred when some of the jurors made calls with their cell phones without prior authorization, even though the trial court had instructed the jurors not to use their cell phones without first informing a court officer of the intent to do so and of the intended topic of the call. After the matter came to the trial court's attention, it inquired of the jurors, who "indicated as a whole" they had not discussed or received information relevant to the case during their cell phone conversations. *Id.* at *9. The court polled the jurors individually, and each indicated that any cell phone conversations were limited to personal or family matters. *Id.* This court concluded that the State's burden to rebut the presumption of prejudice was satisfied by the jurors' assurances they had not engaged in any communication about the case. *Id.*

In *James Dellinger and Gary Wayne Sutton v. State*, No. E2004-01068-CCA-R3-PC, 2006 WL 1679595, at *22-23 (Tenn. Crim. App. June 19, 2006), *perm. app. denied* (Tenn. Oct. 30, 2006), the post-conviction petitioners argued that a separation of the sequestered jury occurred during a "family night" at which the jurors' family members were allowed to visit the jurors. A juror testified that family night took place in a "big room," that the court officers did not monitor his private conversation with his family,

and that to his knowledge, the jurors did not violate any of the instructions about not discussing the case. This court determined that the petitioners were not entitled to post-conviction relief because they failed to establish a separation of the jury because the evidence did not show "that the jurors were outside the presence of the court officers during the family gathering." *James Dellinger*, 2009 WL 1679595, at *23. The *James Dellinger* court contrasted the *Bondurant* case on the basis that the jurors had been outside the control of the court officer when they traveled to and from the courthouse and that *Bondurant* involved more than a possibility of jury separation.

In the present case, the Defendant challenges the jurors' possession of cell phones as a prohibited separation of the jury. He has not alleged or offered any proof that they actually used their phones to communicate with persons outside the jury or to engage in prohibited internet research about the case. We conclude that he has shown a possibility of a separation but that he has not shown an actual separation occurred. *See McClain*, 667 S.W.2d at 66. In reaching our conclusion, we distinguish this case from *Jeffrey D. Allen*, in which case a separation was shown because some jurors used their cell phones to make calls without obtaining permission in advance, contrary to the trial court's instructions, and from *Jackson*, in which actual separation was shown through jurors' contact with third parties. We likewise distinguish the present case from *Bondurant*, in which actual physical separation of the jurors from the court officer was shown. Because the Defendant in the present case did not make a prima facie showing of a jury separation, prejudice cannot be presumed.

In reviewing this issue, we have noted that neither the Code nor Tennessee appellate courts has directly addressed what, if any, electronic devices jury members are allowed to retain during sequestered trials. The pattern jury instruction regarding independent research or discussion addresses the matter indirectly:

> I know that many of you use cell phones, Blackberries, the internet and other tools of technology. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website, through any internet chat room, or by way of any other social networking websites, including, but not limited to, Facebook, My Space, LinkedIn, and YouTube.

7 *Tennessee Practice*, T.P.I.—Crim. 1.09 (18th ed. 2014). The pattern instruction admonishes jurors not to use electronic devices or social media to communicate "about

the case," but it stops short of prohibiting all usage. We acknowledge, though, that the pattern instruction is not specific to trials in which the jury is sequestered. As our supreme court noted in *Smith*, modern communications technology dramatically increases the risk that jurors will conduct outside research and investigation and that they will engage in prohibited communications with third parties. *Smith*, 418 S.W.3d at 47. In the absence of any specific directives from our supreme court, though, trial courts, particularly those conducting trials involving sequestered juries, should consider limiting jurors' access to personal electronic devices and utilizing the pattern jury instruction regarding electronic communication.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____

ROBERT H. MONTGOMERY, JR., JUDGE