IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

January 9, 2019 Session

## STATE OF TENNESSEE v. RODDAROUS MARCUS BOND

**Appeal from the Circuit Court for Madison County**
**No. 14-517    Kyle Atkins, Judge**

_____

### No. W2018-00107-CCA-R3-CD

_____

The Defendant, Roddarous Bond, was convicted of two counts of conspiracy to commit first degree murder.  The trial court merged the two convictions and imposed a twenty-three-year sentence.  On appeal, the Defendant asserts that: (1) the evidence is insufficient to support the offenses; (2) the trial court erred in allowing witnesses to refer to letters that had been destroyed; and (3) the trial court erred in allowing the State to impeach the Defendant with a prior statement that the trial court had excluded.  Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

David W. Camp and Alexander D. Camp (on appeal), Jackson, Tennessee; and George Morton Googe, District Public Defender, and John D. Hamilton, Assistant Public Defender (at trial), for the Appellant, Roddarous Marcus Bond.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jody Pickens, District Attorney General; and Aaron J. Chaplin and J. Michael Mosier, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

The Defendant was convicted of conspiring to commit first degree murder of Mrs. Chermaine Owens Shivers and her sixteen-year-old son, J.S.,[1] who were the two survivors of a home invasion committed by Mr. Derrick Wade and Mr. Johnny Wade on January 15, 2014, in Jackson, Tennessee. During the home invasion, Mrs. Shivers's husband, Mr. Johnny Shivers, and her other son, Mr. Markel Owens, were shot and killed. Mrs. Shivers and J.S. identified the Wades as the gunmen. Mr. Derrick Wade was apprehended on January 16, and Mr. Johnny Wade was apprehended two to three days later. The evidence presented at trial established that while incarcerated, Mr. Johnny Wade contacted the Defendant through Mr. Johnny Wade's girlfriend and requested that the Defendant kill Mrs. Shivers and J.S. to prevent them from testifying against the Wades. The Defendant agreed to do so, but he was arrested before he carried out the murders. The Defendant and Mr. Johnny Wade were both charged in connection with the conspiracy, and their cases were severed for the purposes of trial.

Mrs. Shivers testified at the Defendant's trial that she and J.S. did not return to their home following the shooting. They stayed at a hotel for a period of time, but they did not tell anyone where they were staying. Prior to the preliminary hearing in the Wades' trial, detectives contacted her and informed her of a plan to kill her and her son to prevent them from testifying at the murder trial. Mrs. Shivers and J.S. went into hiding as a result. J.S. began receiving multiple calls from unknown individuals and changed his telephone number. J.S. testified at the preliminary hearing for the murder trial, and he and Mrs. Shivers both testified at Mr. Johnny Wade's murder trial.

Jackson Police Investigator Daniel Long of the Major Crimes Unit began monitoring the Wades' telephone calls from the jail. Mr. Johnny Wade called his girlfriend, Ms. Keyannae Owens, on multiple occasions, during which he made comments such as, "No witness, no case, you know what I'm saying?" He also called Ms. Owens and referenced letters, asking if the letters had reached the individuals to whom they were addressed. He stated during the calls that he had sent the letters as if they were written by other inmates to prevent officers from easily tracking them.

Investigator Long stated that Mr. Johnny Wade and Ms. Owens also discussed the Defendant during their telephone conversations. Ms. Owens told Mr. Johnny Wade that she had given a letter to the Defendant. Investigator Long obtained the Defendant's cell phone records and noted multiple calls between the Defendant and Ms. Owens between January 24, 2014, and February 12, 2014, many of which lasted several minutes. Investigator Long plotted the cell phone towers that the Defendant utilized when making calls. Investigator Long noted that tower 187, sector two encompassed the area where the victims' home was located and where the murder occurred. On Saturday, January 25

---

[1] It is the policy of this court to refer to minor victims by their initials.

between 10:49 a.m. and 11:20 a.m., the Defendant made calls, and his cell phone utilized tower 187, sector two. During a call on Saturday, February 1 at 7:29 p.m., the Defendant's cell phone utilized tower 187, sector three.

On February 4, 2014, Mr. Johnny Wade spoke to the Defendant during a three-way call with Mr. Johnny Wade's grandmother about whether the Defendant had contacted the surviving witnesses to the murders. The Defendant replied that the witnesses had moved and could not be found. Mr. Johnny Wade also told the Defendant that he had written a letter to him. Investigator Long later obtained the Defendant's telephone number and confirmed that the number was the same number that Mr. Johnny Wade had instructed his grandmother to call during the three-way call. At the time of the call, Mr. Johnny Wade's preliminary hearing was approaching, and the primary witnesses were Mrs. Shivers and J.S.

On February 12, police officers detained and interviewed Ms. Owens. There were no additional calls between Ms. Owens and the Defendant after February 12. On February 13, Mr. Johnny Wade used another inmate's pin number to call his grandmother, who then called the Defendant. Mr. Johnny Wade gave J.S.'s telephone number to his grandmother to pass along to the Defendant.

On cross-examination, Investigator Long testified that the Defendant and Ms. Owens often played "phone tag" during the calls. Investigator Long acknowledged that during a three-way call with Mr. Johnny Wade on February 9, the Defendant said he had not received a letter. Investigator Long did not know whether the Defendant ever received a letter. Investigator Long could not determine the Defendant's exact location when the Defendant made calls from his cell phone. Investigator Long did not know the ranges of the cell phone towers and described a fifteen-mile range as a "broad answer" because other cell phone towers were located within fifteen miles of tower 187.

Ms. Jasmine Tell, the records custodian for Verizon Wireless, confirmed Investigator Long's testimony about the calls made by the Defendant in which his cell phone utilized tower 187. Ms. Tell testified that a cell tower may cover a fifteen-mile radius and that, as a result, the Defendant could have been fifteen miles away from tower 187 when he made the calls. J.S.'s cell phone number was not listed in the Defendant's cell phone records.

Ms. Keyannae Owens, Mr. Johnny Wade's former girlfriend, testified that she visited with him and had telephone conversations with him while he was in jail after he was charged with first degree murder. At the end of January of 2014, she received a letter from Mr. Johnny Wade instructing her to contact the Defendant, provide him with J.S.'s telephone number, and tell the Defendant to contact J.S. Ms. Owens had not

previously had any contact with the Defendant. She called the Defendant and said, "Johnny needs you to get rid of the witness." The Defendant responded, "Okay. Say no more." Ms. Owens testified that she believed the Defendant was going to be "[t]aking care of the witness." She later testified that she believed the Defendant's statement meant that he was going to "get rid of" the victims to ensure that they did not come to court. Ms. Owens relayed the Defendant's statement to Mr. Johnny Wade during a telephone conversation.

Ms. Owens stated that she also contacted the Defendant and asked him to put money in Mr. Johnny Wade's commissary account. The Defendant was attending college in Murfreesboro and told her that he was coming to Jackson on the weekends. Ms. Owens met with the Defendant during the second or third week in January after Mr. Johnny Wade's arrest, and the Defendant gave her money to put in Mr. Johnny Wade's commissary account.

Ms. Owens testified that Mr. Johnny Wade asked her to call Mr. Derrick Wade's former girlfriend in an effort to dissuade her from attending court proceedings related to the murder charges. Ms. Owens said she contacted Mr. Derrick Wade's former girlfriend but denied trying to prevent her from attending the proceedings.

Ms. Owens stated that police officers came to her home a few days prior to Mr. Johnny Wade's preliminary hearing to search for the letter. She said that Mr. Johnny Wade told her to destroy the letter and that she informed officers that she did so. After searching her home, officers transported her to the police department where she gave a statement.

Jackson Police Sergeant Chris Chestnut of the Major Crimes Unit was involved in the initial murder investigation. The preliminary hearing for the murders was held on February 13, 2014. Officers obtained a search warrant for Ms. Owens's home to search for the letter mentioned in various calls between Mr. Johnny Wade and Ms. Owens. Ms. Owens was brought to the police department for questioning, and she initially denied any involvement. Sergeant Chestnut stated that Ms. Owens was transported to the jail to give officers time to speak with the district attorney general. Sergeant Chestnut was contacted by the jail officials and informed that Ms. Owens wanted to speak to him. She told him what the letter had stated and the directions that she had been given. She also provided him with a cell phone number that he recognized as belonging to J.S.

The Defendant was arrested, and Sergeant Chestnut interviewed him on February 17 after the Defendant waived his rights and agreed to speak to him. The Defendant denied attempting to locate or contact the victims. He also denied seeing any letters written to him by Mr. Johnny Wade. The Defendant maintained that he only gave Mr.

Johnny Wade's girlfriend money for his commissary account. When asked about telling Mr. Johnny Wade that the witnesses had moved and could not be found, the Defendant said someone, possibly Mr. Johnny Wade's girlfriend, called and told him the information and that he was merely relaying the message to Mr. Johnny Wade. The Defendant maintained that he was in Murfreesboro at the time.

Mr. Danny Parker testified that in May 2014, he was an inmate in the Madison County Jail serving a sentence on a conviction for driving under the influence ("DUI"). He was a trustee at the jail and had contact with the Defendant on a regular basis. Mr. Parker stated that the Defendant asked him to pass a "kite," a small piece of paper on which inmates write notes, to "John," who was charged with murder. Mr. Parker read the note, in which the Defendant stated that he wanted the new address of the victims in order to plan a drive-by shooting. After reading the note, Mr. Parker tore it up and threw it down a drain.

Mr. Parker testified that three or four weeks before he was released in June 2014, the Defendant asked him if he wanted to make some "quick money." Mr. Parker said the Defendant offered him $5,000 to "take care of the mother and the son." The Defendant offered to provide him with a gun and said he would send someone with Mr. Parker. Mr. Parker stated that he shook his head and walked away.

Once Mr. Parker was released from the Madison County Jail, he was transferred to the Chester County Jail on a pending DUI charge but was subsequently released. He approached police officers with the information regarding the Defendant sometime after his release from the Madison County Jail and gave a statement on July 18, 2014. His DUI charge in Chester County was still pending at the time of trial. He stated that he was told that he would receive consideration due to his cooperation but later testified on cross-examination that he was not receiving any consideration on his pending DUI charge.

The Defendant testified that in early 2014, he was living in Murfreesboro and attending college. He came home to Jackson often on the weekends. He denied the allegations and denied ever receiving a letter written by Mr. Johnny Wade from Ms. Owens. The Defendant stated that the home of his former girlfriend, the place of employment of his father's girlfriend, and a pet store were all located in the area of the victims' home, which would explain why he was in the area in late January and early February of 2014. He also stated that on February 1, 2014, he was in the area because he went to a nearby liquor store to purchase liquor for his mother's birthday.

The Defendant explained that when he told Mr. Johnny Wade that "they can't be found," he was referring to someone in Ripley, Tennessee, who owed money to Mr.

Johnny Wade. The Defendant denied speaking to Mr. Parker or having access to $5,000. The Defendant stated that the trustees in the jail were mad at him because he was difficult with them.

On cross-examination, the Defendant acknowledged speaking to Ms. Owens multiple times following Mr. Johnny Wade's arrest. The Defendant stated that he was not on the street where the victims' home was located on January 25 but was at his former girlfriend's home and a pet store, both of which were located nearby. He stated that on February 1, his father's girlfriend drove him to a liquor store located in the area and that he then dropped her off at her work. He explained that he did not tell this to the police officers because they did not ask him.

The Defendant testified that during a telephone conversation on February 4, Mr. Johnny Wade cut him off after the Defendant stated that "they can't be found." The Defendant denied stating "they had moved" and said Mr. Johnny Wade's grandmother made the statement. The Defendant denied that he was referring to the victims and maintained that he was referring to someone in Ripley.

The Defendant stated that he had known Mr. Johnny Wade since they were freshmen in high school. The Defendant agreed that their relationship was such that he gave money to Mr. Johnny Wade when asked. The Defendant denied that he would injure witnesses for him or that he would participate in a crime with Mr. Johnny Wade if asked. The Defendant agreed that he told Sergeant Chestnut that if Mr. Johnny Wade had asked him to assist in committing the robbery that led to the murders, the Defendant would have done so.

The Defendant was charged with two counts of conspiracy to commit first degree murder, two counts of attempted coercion of a witness, and two counts of solicitation of first degree murder. The jury convicted the Defendant of two counts of conspiracy to commit first degree murder and acquitted him of the remaining counts. The trial court merged the two convictions and imposed a twenty-three-year sentence.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant maintains that the evidence is insufficient to support his two convictions for conspiracy to commit first degree murder because the State failed to establish that he committed an overt act in pursuance of the conspiracy. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

A conspiracy is committed

if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engaged in conduct that constitutes the offense.

T.C.A. § 39-12-103(a). A defendant may not be convicted of conspiracy to commit an offense "unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d). The underlying offense of the conspiracy in the present case was first degree murder, which is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Even though the Defendant did not complete the first degree murder of the victims, it is not a defense "that the offense that was the object of the conspiracy was not committed." T.C.A. § 39-12-103(f).

The essential feature of the crime of conspiracy is the "agreement to accomplish a criminal or unlawful act." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998). To prove a conspiracy, the State need not show a formal agreement between the parties to commit the unlawful act. *See id.*; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). Rather, "a mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement." *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); *see Randolph*, 570 S.W.2d at 871. "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise." *Randolph*, 570 S.W.2d at 871.

The evidence presented at trial, when viewed in a light most favorable to the State, established that Mr. Johnny Wade sought to have the victims killed in order to prevent them from testifying against him in relation to his pending murder charges. He contacted the Defendant through Ms. Owens. When Ms. Owens told the Defendant that "Johnny needs you to get rid of the witnesses," the Defendant replied, "Okay. Say no more." The jury could infer from this evidence that the Defendant agreed to assist Mr. Johnny Wade in killing the victims.

The Defendant maintains that the evidence fails to establish that he committed any overt acts in pursuance of the conspiracy. The indictment alleged that the Defendant committed overt acts by attempting to locate the victims at their address and/or by soliciting a third party to kill the victims.

According to the Defendant's cell phone records, he made calls on January 25 and February 1, 2014, during which his cell phone utilized the cell tower that covered the area in which the victims lived. The Defendant challenges the reliability of the evidence, arguing that the evidence is "misleading" and "results in vague and ambiguous information which prejudices the jury and therefore results in the jury reaching a speculative conclusion." To the extent that the Defendant is challenging the admission of this evidence, he has waived this argument because he withdrew any objection to the admission of the evidence during a pretrial hearing. Nevertheless, we note that the Defendant admitted at trial that he was in the area in which the cell tower encompassed on those dates for other reasons and maintained that he did not attempt to locate the victims at their home. However, when he spoke to Mr. Johnny Wade a few days after being in the area, the Defendant stated that the victims could not be located. It was within the province of the jury to reject the Defendant's testimony regarding his reasons for being in the area. Based upon the Defendant's conversation with Mr. Johnny Wade a few days after being in the area, the jury could reasonably infer that the Defendant was in the area in an effort to locate the victims.

Mr. Parker also testified that the Defendant offered to pay him $5,000 to murder the victims. Therefore, we conclude that the evidence is sufficient to support the Defendant's convictions of conspiracy to commit first degree murder of the victims.

## II. Admission of Testimony Regarding Destroyed Letters

The Defendant contends that the trial court erred in admitting testimony from Ms. Owens and Mr. Parker about letters that each of the witnesses destroyed prior to trial. The Defendant argues that the witnesses destroyed the letters in bad faith and that their testimony regarding the letters was inadmissible pursuant to Tennessee Rule of Evidence 1004(1). The States responds that the trial court did not err in admitting the testimony because the State, as the proponent of the evidence, neither destroyed the letters nor did so in bad faith.

Prior to trial, the Defendant filed a motion in limine to exclude any reference to the letters, arguing that such testimony was inadmissible hearsay. He stated that while the parties anticipated that the State would argue that references to the letters should be allowed pursuant to Tennessee Rule of Evidence 1004, any reference to the letters would be unduly prejudicial. The State filed a response, maintaining that the admission of the testimony would not be unduly prejudicial and that such testimony fell within multiple hearsay exceptions. At the conclusion of the pretrial hearing, the trial court denied the Defendant's motion, finding that testimony regarding the letters fell within multiple hearsay exceptions and that the admission of the testimony was not unfairly prejudicial.

The admissibility of evidence is within the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion. *See Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008). Tennessee Rule of Evidence 1002 generally provides that in order to prove "the content of a writing, recording, or photograph, the original writing, recording or photograph is required." However, the original or a writing is not required if "[a]ll originals are lost or destroyed, unless the proponent lost or destroyed them in bad faith." Tenn. R. Evid. 1004(1).

Although the Defendant maintains on appeal that the letters were destroyed in bad faith, he did not raise this argument in his motion in limine or during the pretrial hearing on the motion. During the pretrial hearing, defense counsel mentioned Rule 1004 and conceded, "So Parker and Owens I guess could get up there and talk about what the letter said." Defense counsel, however, argued that the admission of testimony about the letters would be "unduly prejudicial." Because the Defendant failed to object to the admission of the testimony based upon Rule 1004 at trial, the issue is waived. *See* Tenn. R. App. P. 36(a); *see also* Tenn. R. Evid. 103(a) ("Error may not be predicated upon a upon a ruling which admits … evidence unless a substantial right of the party is affected, and … a

timely objection or motion to strike appears of record, stating the specific ground of objection[.]").

The Defendant argued at trial and on appeal that the admission of the testimony regarding the letters was unfairly prejudicial pursuant to Tennessee Rule of Evidence 403. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice…." Tenn. R. Evid. 403.

The testimony regarding the letters was relevant as proof of the plan to murder the victims. Testimony regarding the witnesses' destruction of the letters was presented at trial and was available to the jury for its consideration in assessing the credibility of the witnesses and determining the weight to be given to the evidence. Although the testimony regarding the content of the letters was prejudicial in the sense that the testimony provided evidence against the Defendant, such testimony was not unfairly prejudicial under the facts and circumstances of this case. *See State v. Ronald W. Damon*, No. M2012-02263-CCA-R3-CD, 2014 WL 1669959, at *43 (Tenn. Crim. App. Apr. 25, 2014) (holding that testimony about the contents of a letter that was never produced at trial was not unfairly prejudicial when the unavailability of the letter was presented to the jury for its consideration in assessing the witnesses' credibility and the weight to be given to the evidence). Accordingly, the trial court properly exercised its discretion in admitting the evidence.

### III. Impeachment of the Defendant

The Defendant maintains that the trial court erred in allowing the prosecutor to impeach him on cross-examination with a statement he made to the police that the trial court had excluded earlier during the trial. The Defendant argues that the prosecutor asked questions on cross-examination in an effort to create an opening to allow him to introduce the previously excluded evidence.

During its case-in-chief, the State sought to play the recording of the police interview of the Defendant. Defense counsel objected to the admission of the Defendant's recorded statement that if the Wades had asked him to accompany them to commit the initial robbery, he would have gone with them. Defense counsel argued that the statement was irrelevant and unfairly prejudicial. The State argued that the statement was relevant as evidence of the Defendant's relationship with Mr. Johnny Wade. The

trial court noted that evidence had been presented that the Defendant was a known associate of the Wades. The trial court excluded the statement, finding that the prejudicial nature of the statement was "overwhelming" and outweighed any relevance.

When the Defendant later testified at trial, the prosecutor questioned him on cross-examination regarding his relationship with Mr. Johnny Wade. In response to the prosecutor's questions, the Defendant testified that he had known Mr. Johnny Wade since they were in the ninth grade and that they "used to get girls together and that's about it." The Defendant acknowledged that they were close and that Mr. Johnny Wade asked him for money when Mr. Johnny Wade called him from the jail. The Defendant denied that he would "take care of witnesses" for Mr. Johnny Wade if asked. The prosecutor then changed subjects, questioning the Defendant regarding his presence in the area of the victims' home on two occasions, the telephone calls between him and Ms. Owens, his claim to the police that he did not know the name of Mr. Johnny Wade's girlfriend, his claims that he was in Murfreesboro during various time periods, and Mr. Parker's testimony regarding the exchanging of letters while the Defendant was in jail. Following this extensive cross-examination, the prosecutor asked the following question about the Defendant's relationship with Mr. Johnny Wade:

Q      If he'd asked you to participate in a crime you wouldn't do it?

A      No.

The prosecutor then requested that he be permitted to question the Defendant about his statement during the police interview. During a bench conference, the prosecutor argued that the Defendant's prior statement was admissible to show his association with Mr. Johnny Wade and to impeach the Defendant's testimony. Defense counsel continued to argue that the Defendant's statement was irrelevant and unfairly prejudicial. The trial court found that the statement was admissible for impeachment purposes, which "reduces the effect of the prejudicial value of it."

The prosecutor then questioned the Defendant as follows:

Q      Mr. Bond, I asked you a second ago that if Johnny Wade asked you
to commit a crime would you commit it?

A      Right.

Q      And what was your response?

A      No.

- 11 -

Q      Now, do you recall meeting with Sergeant Chestnut in an interview?

A      Yes.

Q      And you said if they—Do you recall in that interview saying, "If they had asked me to commit the robbery I would have gone with them"?

A      Yes.

Q      So it was not true—it's not a true statement, then, to say that if they asked you to commit a crime that you wouldn't participate in that, would you?

A      I said it's their type of crime.

Q      Well, this was a robbery that ended in a double homicide, correct?

A      Correct.

Q      And you knew that when you were talking to him, right?

A      Right.

Q      This was a robbery with guns and people were killed, right?

A      Right.

Q      So what type of crime would you—are you referring to, then?

A      Killing people, raping people.

Q      They did kill people, Mr. Bond.  Right?  Didn't they?

A      I don't know.  I wasn't there.

Q      And you said you would have participated in that, right?  If they had called you.  Isn't that what you said?

A      Yes.

Tennessee Rule of Evidence 613 permits impeachment of a witness with a prior inconsistent statement. A prior inconsistent statement also may be used as substantive evidence under certain circumstances. *See* Tenn. R. Evid. 803(26). However, the trial court did not allow the Defendant's prior statement to be introduced as substantive evidence but allowed the prosecutor to question the Defendant about the prior statement for purposes of impeachment. If a prior inconsistent statement is introduced only for impeachment purposes, "it is well established that a witness may not be impeached primarily for the purpose of introducing the prior inconsistent statement." Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.13[2][d] (6th ed. 2011); *see State v. Rayfield*, 507 S.W.3d 682, 698 (Tenn. Crim. App. 2015). This court has recognized that "[i]mpeachment cannot be a 'mere ruse' to present to the jury prejudicial or improper testimony.'" *State v. Jones*, 15 S.W.3d 880, 892 (Tenn. Crim. App. 1999) (citing *State v. Roy L. Payne*, No. 03C01-9202-CR-00045, 1993 WL 20116, at *2 (Tenn. Crim. App. Feb. 2, 1993)). In such situations, a jury may "misuse the statement by considering it as substantive evidence." Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.13[2][d] (6th ed. 2011).

In the present case, the trial court had excluded evidence of the Defendant's prior statement as substantive evidence earlier in the trial. While a defendant risks impeachment by choosing to testify, he does not open himself up to questioning about any and all evidence regardless of its admissibility. The Defendant did not open the door to questioning about his prior excluded statement through his testimony on direct examination or in response to earlier questions on cross-examination regarding his relationship with Mr. Johnny Wade. The prosecutor then abandoned the line of questioning and proceeded to question the Defendant regarding other aspects of the case. After this extensive cross-examination, the prosecutor then asked, "If he'd asked you to participate in a crime you wouldn't do it?" We conclude that the record demonstrates that this question was designed to elicit an answer that would then allow the prosecutor to question the Defendant regarding evidence that the trial court had earlier excluded. As such, the question was a "mere ruse" to circumvent the trial court's earlier ruling and to present improper evidence to the jury. The prosecutor did not merely impeach the Defendant with the prior statement but questioned the Defendant regarding the circumstances of the robbery and murder and the Defendant's willingness to participate in such crimes. Under the specific circumstances of the case, we hold that the trial court erred in allowing the prosecutor to question the Defendant about his prior statement.

This error in admitting evidence is subject to harmless error analysis, and thus, relief is available only where the "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. 36(b). This analysis "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the

crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (citations omitted). The evidence presented to support the Defendant's convictions was strong and included the testimony of Ms. Owens regarding her communications with the Defendant and with Mr. Johnny Wade, recordings of telephone conversations between Mr. Johnny Wade and the Defendant and others, telephone records corroborating Ms. Owens' testimony regarding her contact with the Defendant, the Defendant's presence in the area of the victims' home on two occasions after which he contacted Mr. Johnny Wade and reported that the witnesses could not be located, the Defendant's testimony at trial in which he admitted that he was in the area on those occasions, and his continued efforts to arrange for the victims' murders following his arrest. Despite the error, the jury was able to consider and weigh the evidence and acquitted him of four of the charges. We cannot conclude that the error "more probably than not affected the judgment" or resulted in "prejudice to the judicial process." Tenn. R. App. P. 36(b). Therefore, we conclude that the error was harmless.

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE