IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 10, 2021 Session

## DENNIS ALLEN RAYFIELD v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Wayne County**
**No. 15892    David L. Allen, Judge**

_____

### No. M2020-00546-CCA-R3-PC
_____

The petitioner, Dennis Allen Rayfield, appeals the denial of his petition for post-conviction relief, which petition challenged his conviction of first degree murder, alleging that the trial court committed errors which deprived him of his constitutional rights to due process and a fair trial and that he was deprived of the effective assistance of counsel. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Brandon E. White, Columbia, Tennessee (on appeal); and Shara Ann Flacy, Ardmore, Tennessee (at hearing), for the appellant, Dennis Allen Rayfield.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; and Brent A. Cooper, District Attorney General, for the appellee, State of Tennessee.

### OPINION

      A Wayne County petit jury convicted the petitioner of the first degree murder of his estranged wife, Julie Rayfield, who was shot to death in her home in March 2012. *State v. Rayfield*, 507 S.W.3d 682, 684 (Tenn. Crim. App. 2015). At the time of her death, the victim was preparing to initiate divorce proceedings against the petitioner. *Id.* This court summarized the evidence on direct appeal:

> [T]he evidence shows that the [petitioner] did not want a
> divorce and was upset about the amount of child support he
> would be required to pay. The [petitioner] had existing

problems with remaining current in his child support obligations for his children from his first marriage. Although the victim's attorney thought, based upon the information he had been provided, that the victim should seek an order of protection against the [petitioner] and that the victim should not personally present the divorce paperwork to the [petitioner], the victim planned to meet with the [petitioner] on March 17 or 18 and provide him with the documents. The victim was found dead from a gunshot wound to the head on March 19.

Despite having made plans to visit Ms. [Amanda] Isbell on the evening of March 18, 2012, the [petitioner] never appeared at her house and failed to communicate with her about his change in plans. The truck the [petitioner] drove was seen at Mount Hope United Methodist Church around 9:18 p.m., and no person was seen near the truck. On March 24, a bloodhound tracked the [petitioner's] scent from the front steps of the victim's home to the same location in the Mount Hope United Methodist Church parking lot where the truck the [petitioner] drove was parked on the night of March 18.

Although the bullet removed from the victim's body was too damaged to be matched through ballistics testing to a particular weapon, .22 caliber weapons were found in the [petitioner's] mother's home, and .22 caliber ammunition was recovered from the truck the [petitioner] drove and the [petitioner's] mother's house. The [petitioner] acknowledged owning .22 caliber weapons and admitted he had two .22 caliber weapons with him when he went rock crawling on March 18, 2012. The bullet removed during the autopsy was consistent with the caliber and brand of ammunition recovered from the truck the [petitioner] drove.

. . . .

From the proof, the jury could infer that the [petitioner] traveled about one-fourth of one mile on foot from Mount Hope United Methodist Church to the victim's house, where he placed a barrel under a window, removed the screen, entered the house through the open window, shot the victim in the head

with a .22 caliber weapon, left through the front door, went to his mother's house, and waited until the body had been discovered the next day before initiating any contact with the authorities.

*Id.* at 694-95. The jury convicted the petitioner of first degree murder, and the trial court imposed a life sentence. *Id.* at 692. This court affirmed the petitioner's conviction on appeal, and our supreme court denied further review. *Id.* at 684.

The petitioner filed a timely pro se petition for post-conviction relief, and after the appointment of counsel, he filed an amended petition, alleging multiple instances of ineffective assistance of counsel and violations of his right to a fair trial.

At the January 2019 evidentiary hearing, the petitioner's first trial counsel[1] testified that he was appointed to represent the petitioner at the beginning of this case. He recalled that the petitioner was able to make a $250,000 bond but that, after a hearing on his indigency status, the court concluded that the petitioner was indigent and allowed the petitioner to proceed with appointed counsel. First counsel said that as part of discovery materials, he received a report from the Tennessee Bureau of Investigation ("TBI") laboratory that indicated that gunshot residue was found on the victim but not on the petitioner. He said that he would have argued to the jury the importance of the petitioner's testing negative for gunshot residue but noted that the petitioner was arrested the day after the shooting and that if the petitioner "had showered or anything, you wouldn't expect any residue." First counsel identified another report from the discovery materials that indicated that no traces of blood were found in the petitioner's vehicle or on any item collected from the vehicle or from the petitioner's person. He said that he would have "[c]ertainly" wanted the jury to see that report.

First counsel recalled filing a standard motion to exclude autopsy photographs from trial, explaining that "any photograph that would show blood or tend to be gruesome or horrific, you would want the [c]ourt to consider excluding." He viewed black-and-white copies of photographs of the victim taken at the crime scene, the originals of which were admitted as trial exhibits. He said that a photograph showing the victim lying on the bathroom floor was one that he would prefer the jury to see over one showing a gunshot wound because the photograph did not appear to show any blood. As for a photograph showing "a close-up of the left side of [the victim's] face showing blood coming from somewhere -- it looks like going into her eye and down the side of her nose,"

---

[1] The petitioner was appointed counsel who represented him up until two months before trial, at which point, the petitioner hired new trial counsel. Because all claims of ineffective asisstance are against the petitioner's second, retained attorney, we will refer to him as "trial counsel" and to the petitioner's first, appointed attorney as "first counsel."

first counsel said that he "would want to jump up and down on and say, Judge, don't show that to the jury" because it was gory. He said that he would also have objected to the admission of a photograph showing what appeared to be "blood oozing from the wound around [the victim's] head." He conceded, however, that in his experience, the State "always get[s] something in that . . . I wish hadn't come in."

During cross-examination, first counsel acknowledged that trial counsel's "time would have been severely limited" to prepare for the trial, noting that he withdrew from the case because the petitioner retained trial counsel. He said that he and the petitioner's sister "didn't see the facts in the same way" and that the sister came to his office one day in January 2012 and "became so demeaning and insulting to me that I asked her to leave my office." He said that the petitioner was present during that incident and that after the petitioner's sister left the office, he and the petitioner met for "another 45 minutes or so." Shortly after that incident, the petitioner's family hired trial counsel. First counsel explained that the petitioner told him that the police officer who had reported seeing the petitioner's vehicle parked at a church near the victim's house on the night of the murder was lying. After investigating the matter, first counsel concluded that the officer was not lying and told the petitioner that he would not call the petitioner to testify that his vehicle was not at the church that night. First counsel said that this was the issue over which the petitioner's sister became angry. He said that he thought that "there was a lot to say" in the petitioner's defense but that the petitioner's wanting to say that his truck was not at the church when there was "what a jury would consider conclusive" proof, would have been difficult to overcome, stating, "[A] jury will convict a fellow of lying quicker than anything else."

On redirect examination, first counsel testified that a TBI official firearms report included in the discovery materials indicated that the bullet recovered from the victim was "'a .22 long rifle caliber . . . consistent with Remington manufacture'" and was of "'the same type and design as the Remington .22 long rifle cartridge'" that was recovered "'from the center console of [the petitioner's] truck.'" First counsel said that he would not have advised the petitioner to testify in his own defense because he expected the petitioner to testify that his truck was not at the church on the night of the victim's death and that such testimony would make the petitioner "look like a liar." First counsel said, "My opinion is that he would have been better off just sitting and letting his attorney make the argument that . . . there's not enough evidence here to convict."

Trial counsel testified that he was retained in February 2012 by "[s]ome members of [the petitioner's] family," who expressed "their need for a new attorney on the case." He said that he sought funds from the court for an investigator to aid his preparation, noting that the petitioner "certainly fit the bill" of an indigent defendant. The trial court denied the motion, however, because the petitioner had retained counsel. He

-4-

acknowledged that he did not offer an affidavit of indigency at the hearing on the matter but said that "[i]t was my understanding that [the petitioner] had already been found indigent for purposes of the proceedings" and that he did not believe that the petitioner's financial circumstances had changed since that determination. Trial counsel said that the trial court simply stated, "I'm not giving you the funds for an investigator, . . . you're retained counsel, and that was it." He recalled "being somewhat shocked" that the trial court denied the petitioner funds for an investigator.

Trial counsel said that the petitioner would have seen the jury venire list that was at the defense table during trial. He said that he discussed jury selection with the petitioner but could not recall whether "I had the discussion with [the petitioner] himself or with someone in his family, but that discussion was held." He recalled that the petitioner told him that Juror A.B. had previously witnessed the petitioner shoot a dog but said that the petitioner did not reveal this information until "after the jury had been . . . seated and sworn," and, consequently, he did not challenge A.B.'s inclusion in the jury.

Trial counsel testified that he was retained in February 2012, "got the file in March and we went to trial in May of the same year. . . . [I]t was a matter of luck that we were able to know as much about this case as we did." He explained that he did not object to admission of the petitioner's .22 bolt-action Crickett gun, .22 Ruger gun, or the "various caliber of ammunition" because "[t]here was not one bit of evidence presented that any of those weapons were the murder weapon." His strategy was to let the jury see the guns "but then point out that [the murder weapon] could be any number of .22 caliber rifles that exists, even to this day, in Wayne County let alone the state of Tennessee. It could have been any weapon anywhere."

Trial counsel acknowledged that he did not think that the State had conducted "a first-class investigation" in this case and that an expert crime scene investigator could have helped him better prepare to cross-examine the State's witnesses on their handling of the crime scene. He explained, however, that because he "couldn't get funds for an investigator," he did not believe the court would give him the funds for an expert witness, saying, "[T]here was no indication that [the trial court] was going to give us anything we asked for. He hadn't so far." He also said that he did not "have time to find experts." Trial counsel acknowledged that he could have filed an interlocutory appeal challenging the trial court's denial of his motion but said that in light of the "gargantuan task ahead of me," he "didn't have time to go to the court of criminal appeals." He acknowledged that his inability to engage expert witnesses or an investigator in this case constrained his defense strategy.

Trial counsel asserted that "[w]e needed a continuance in this matter. We begged for a continuance in this matter. The judge would not give us a continuance in this

matter." He said that it was "almost inconceivable to prepare for any trial in two months. It's almost inconceivable that the remainder of a man's life lay in the hands of someone who had only 60 days to prepare." He did not challenge the trial court's denial of the motion for a continuance because "[w]e didn't have time to argue with the judge that he's indigent, we need more time. We had to get ready for trial. That's what it was." Trial counsel explained that he "chose to spend my time trying to figure out what was actually going on in the discovery in this case. There was quite a bit of it." He reiterated, "[W]e had this gargantuan task ahead of us and no time to do it." Trial counsel acknowledged that he was not prepared for trial and explained that the "short timeline took a lot off the table" in terms of a defense strategy. Another attorney had agreed to assist counsel at the trial but, because that attorney could not be present on the scheduled trial date and because the trial court would not continue the case, trial counsel had to proceed to trial without assistance. He said that although he could have done more preparation had he been given more time, he "did the best job I could" under the circumstances.

Trial counsel recalled a pretrial discussion about the admissibility of photographs of the victim. He agreed that the three photographs of the victim taken at the crime scene were graphic and gruesome, but he could not recall if the photographs were shown to the jury or admitted for identification only. The parties stipulated that the photographs were displayed to the jury, and trial counsel acknowledged that he should have objected to their admission.

Trial counsel said that his failure to challenge evidence of prior acts of violence by the petitioner was not part of a trial strategy but, rather, was the result of the lack of time that he had to prepare and "to get into the minute details of the trial." He acknowledged that "[a]s it stood, under Rule 404(b), the testimony shouldn't have come in, specifically, because . . . it wasn't relevant to the proceedings." Trial counsel said that he objected to Alexandria Pope's testimony that she had heard the petitioner yelling at the victim over the telephone and that the victim later appeared with a red mark on her chest, but the trial court overruled the objection. He acknowledged that he should have also objected to a portion of Ms. Pope's testimony that amounted to speculation.

Trial counsel testified that the trial judge told the jury during deliberations "that he was going to be out of the county on Friday" and that if they did not reach a verdict that day, the jury would remain sequestered at the hotel on Friday and not return to deliberations until Saturday.

During cross-examination, trial counsel testified that when he agreed to take the petitioner's case, he knew that the trial was scheduled but could not "imagine a judge requiring us to move on to trial that soon." After it "became very clear, very clear, that we were not going to get investigative funds and we were not going to get a continuance," trial

counsel tried the case as best he could. He said that he cross-examined the State's witnesses as best he could and raised numerous objections to evidence. He agreed that it was not always advantageous to object to every inadmissible piece of evidence. At trial, he raised the issue that the crime scene had been contaminated by "[s]everal family members" before law enforcement arrived and that the criminal investigation was sloppy. He maintained that although two months was insufficient time for him to fully prepare for trial in this case, he was as prepared as he could have been with the limited time that he had.

The petitioner testified that he had been found indigent by the trial court when he was appointed first counsel. He said that his family made his bond because he did not have the means to do so and that his sister paid trial counsel to represent him. He denied that his financial situation changed after the indigency determination. The petitioner said that he had received all discovery materials before trial counsel was retained. He denied that trial counsel discussed a defense strategy or whether the petitioner should testify and said that counsel "just flew by the seat of his pants." He did not recall ever seeing a list of the jury venire and said that his first opportunity to discuss potential conflicts with jurors was during jury selection. The petitioner said that he told trial counsel that he had a conflict with Juror A.B. because he had "shot her dog one night when her dog had jumped on my dog" but that counsel said, "'We can't do nothing about it.'"

The petitioner said that he wanted trial counsel to object to the admission of his two firearms but that counsel failed to do so. He posited that the assistance of expert witnesses would have been helpful to his case and that trial counsel should have sought such services from the court. He said that counsel should have offered into evidence the TBI laboratory report that indicated that gunshot residue was found on the victim but not on the petitioner. He also said that trial counsel should have objected to the admission of the photographs of the victim. The petitioner recalled that the trial court told the jury that "they would stay there all night until they reached a verdict, and they wouldn't be going home until they did so."

During cross-examination, the petitioner said that he knew that the outcome at trial would have been different if trial counsel had not made the alleged errors because he was innocent of the crime. He denied that he asked his family to make his bond or to hire an attorney and reiterated that he personally did not have financial resources. He said that he believed the trial court pressured the jury to reach a verdict, which pressure led the jury to convict him.

In its written order denying post-conviction relief, the post-conviction court concluded that the petitioner had failed to establish that Juror A.B. was biased against him by clear and convincing evidence. The court also concluded that, although trial counsel should have objected to evidence of the petitioner's having owned two .22 caliber weapons

and various ammunition, the petitioner was not prejudiced by this evidence. The post-conviction court accredited trial counsel's testimony that "it would have been futile to repeat his request for an investigator or to have requested other expert witness services" after the trial court denied his motion for a state-funded investigator. The court found that trial counsel's bringing into evidence the petitioner's attempts to reconcile with the victim was consistent with his trial strategy of "attempt[ing] to establish that there was no domestic violence in [the p]etitioner's and victim's marriage" and that, even if counsel performed deficiently in this matter, the petitioner was not prejudiced by counsel's actions. As to the admission of the three photographs of the victim, the post-conviction court found that trial counsel did not object to the admission of one photograph "because he intended to use that photograph to support the defense theory that the victim had committed suicide" and concluded that the other two photographs "would have been admitted" over an objection by trial counsel as evidence "illustrating the nature of the injury." The court also concluded that the admission of the photographs did not prejudice the petitioner.

As to the petitioner's due process and fair trial claims, the post-conviction court found that the trial court did not err by denying the petitioner's motion for a continuance because "it was the [p]etitioner's actions" that gave rise to his having new trial counsel only two months before the trial. The post-conviction court also found that the trial court "did not pressure the jury into reaching a verdict" and that the jury agreed to the trial court's stated preference of continuing deliberations that night until a verdict was reached.

In this timely[2] appeal, the petitioner reasserts his arguments that he was deprived of the effective assistance of counsel and that the trial court violated his rights to due process and a fair trial.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast,

---

[2]     The petitioner's notice of appeal is considered timely under our supreme court's order of March 25, 2020, extending the filing deadline due to the COVID-19 pandemic. *In re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Mar. 25, 2020) (Order) ("Deadlines set forth in court rules, statutes, ordinances, administrative rules, or otherwise that are set to expire during the period from Friday, March 13, 2020, through Tuesday, May 5, 2020, are hereby extended through Wednesday, May 6, 2020.").

the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

## *I. Due Process and Fair Trial*

The petitioner argues that the trial court violated his right to due process by denying him a continuance to allow trial counsel to fully prepare for trial and by denying his motion for funds to hire an investigator and that he was denied a fair trial by the inclusion of A.B. on the jury because A.B. harbored bias against him.

In the post-conviction context, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," with certain exceptions not applicable in this case. T.C.A. § 40-30-106(g).

We first note that the petitioner failed to assert his due process claim that the trial court erred by denying his request for a state-funded investigator in either of his petitions for post-conviction relief, and, consequently, that claim is waived. *See State v. Townes*, 56 S.W.3d 30, 35 ("The issue, as stated, was not presented in the post-conviction petition and may not be raised for the first time on appeal." (citing *Cone v. State*, 747 S.W.2d 353, 356 (Tenn. Crim. App. 1987))), *overruled on other grounds by State v. Terry*, 118 S.W.3d 355 (Tenn. 2003).

The remaining alleged trial errors are issues that were ripe for direct appeal of the petitioner's conviction, and the petitioner's failure to raise these issues at that time render them waived for the purposes of post-conviction relief. *See House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995) ("Waiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney."); *see also e.g.*, *State v. Schmeiderer*, 319 S.W.3d 607, 616-18 (Tenn. 2010) (reviewing on direct appeal whether the trial court's denial of the defendant's motion for a continuance denied him a fair trial); *Greene v. State*, No. E2013-01583-CCA-R3-PC, 2014 WL 3698347, at *7 (Tenn. Crim. App., Knoxville, July 24, 2014) (concluding that an issue of juror bias was waived on post-conviction because the petitioner failed to raise it on direct appeal); *Edmund George Zagorski v. State*, No. 01C01-9609-CC-00397, 1997 WL 311926, at *18 (Tenn. Crim. App., Nashville, June 6, 1997) (concluding that the issue of the trial court's denying the petitioner funds for expert services was waived on post-conviction for failure to raise it on direct appeal). Consequently, these claims have been waived for the purposes of post-conviction relief.

This conclusion, however, does not bar our consideration of these alleged errors as they relate to the petitioner's claim of ineffective assistance of counsel, which we discuss below.

## II. Ineffective Assistance of Counsel

The defendant asserts myriad instances of deficient performance by trial counsel, including counsel's failure to challenge the trial court's denial of his motion for a continuance and motion for a state-funded investigator, failure to seek funding for expert witnesses, failure to call TBI Special Agent Russell Davis regarding the gunshot residue report, failure to object to the evidence of the petitioner's owning firearms and ammunition, failure to object to the trial court's pressuring the jury to reach a verdict, opening the door to hearsay and bad act evidence, failure to object to crime scene photographs, and failure to challenge the inclusion of A.B. on the jury. The State contends that the post-conviction court properly denied relief.

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are

made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner has failed to establish that he is entitled to post-conviction relief on the basis of trial counsel's performance. First, trial counsel's accredited testimony established that he believed it would have been an exercise in futility to seek funding for expert witnesses after the trial court declined to find the petitioner indigent for purposes of a state-funded investigator. Counsel explained that he believed his limited time was best spent preparing for trial with the evidence that he had rather than challenging the trial court's denial of his motions for a continuance and for investigative funds. Under the circumstances, this was a reasonable strategic decision. Additionally, the petitioner has failed to show that counsel would have been successful had he challenged the trial court's denial of his motions via an interlocutory or extraordinary appeal. *See State v. Gilley*, 173 S.W.3d 1, 6 (Tenn. 2005) (holding that an interlocutory appeal was erroneously granted when the issue could "be challenged in an appeal as of right" upon conviction); *see also State v. Mann*, 959 S.W.2d 503, 524 (Tenn. 1997) (a less-than-two-month period of time to prepare for trial in a capital case was not inadequate when the newly-appointed counsel had the benefit of prior counsel's seven months of preparation) (citing *State v. Jimmy D. Dillingham*, No. 03C01-9110-CR-319, 1993 WL 22155 (Tenn. Crim. App., Knoxville, Feb. 3, 1993)). Moreover, the petitioner failed to present at the evidentiary hearing what beneficial evidence such services would have uncovered. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."); *Edmund George Zagorski*, 1997 WL 311926, at *18 (post-conviction petitioner failed to establish that he was prejudiced by the trial court's denying him funds for a private investigator or expert witnesses because the petitioner failed to present "what significant information . . . would have [been] discovered that was not known by defense counsel"). We will not speculate on what evidence could have been produced with the services of a private investigator or expert witnesses.

The petitioner also argues that counsel should have objected to the admission of his firearms into evidence on the ground that it was unfairly prejudicial. At trial, the State presented evidence that the petitioner owned multiple .22 caliber firearms and ammunition consistent with the bullet recovered from the victim; it could not be determined whether the fatal shot was fired from one of the petitioner's guns. The petitioner has failed to show that he would have been successful had trial counsel objected to admission of the evidence, which was probative of the material issue of the perpetrator's identity. *See State v. Reid*, 213 S.W.3d 792, 814 (Tenn. 2006) (concluding that the defendant's possession of a weapon similar to that used in the crime "was especially probative as to the identity of the perpetrator"); *see also State v. Hurley*, 876 S.W.2d 57, 67 (Tenn. 1993) (finding "no

merit" to defendant's argument that evidence of his owning a shotgun of the same caliber as the weapon used to kill the victim was unfairly prejudicial), *superseded by statute*, 1995 Tenn. Pub. Acts ch. 53 § 1, *as recognized in State v. Powers*, 101 S.W.3d 383 (Tenn. 2003).

Next, the petitioner contends that trial counsel performed deficiently by placing the nature of the petitioner's relationship with the victim at issue, arguing that trial counsel opened the door to damaging evidence that was otherwise inadmissible under Evidence Rule 404(b) and the hearsay rules. The petitioner points to three incidents described by Ms. Pope that he alleges were admissible only after trial counsel elicited testimony from the State's first witness that he did not know of any domestic violence incidents between the petitioner and the victim: First, Ms. Pope testified to an incident in which the victim arrived at Ms. Pope's house crying and with a handprint mark on her face. Second, Ms. Pope described an incident in which the victim left a party after a heated telephone call with the petitioner and returned to the party appearing upset and with a red mark on her chest.[3] Finally, Ms. Pope testified that approximately one week before the victim's death, the victim seemed scared after Ms. Pope told her that she saw the petitioner driving from the direction of the victim's parent's house and toward the victim's house and that the victim asked Ms. Pope to stay on the telephone with her.

The petitioner has failed to establish that he was prejudiced by trial counsel's failing to object to Ms. Pope's testimony. First, not all of the challenged testimony was inadmissible as the petitioner asserts. Ms. Pope described only two acts by the petitioner: that she heard him yelling at the victim over the telephone and that she saw him driving from the direction of the victim's parents' house and toward the victim's house. Because the petitioner's driving around was not a bad act, Evidence Rule 404(b) did not bar admission of that evidence. Moreover, because Ms. Pope did not hear the substance of the telephone conversation between the victim and the petitioner, the petitioner's yelling during the call was not necessarily a bad act, and, even so, was not so prejudicial that Rule 404(b) required its exclusion. Similarly, because Ms. Pope's statement that she saw the , victim crying and with a handprint mark on her face did not describe any act by the petitioner—although the jury was free to draw the inference that the petitioner caused the victim's injury—Evidence Rule 404(b) does not apply. *See* Tenn. R. Evid. 404(b); *State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002) ("It is well established that in a criminal trial, evidence of a *defendant's* prior misconduct is inadmissible to establish the accused's bad character or criminal propensity.") (citations omitted)). Even if Rule 404(b) applied, the evidence was admissible to show that the petitioner had a "settled purpose to harm the victim." *See State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App., 2008) ("[O]ur supreme court has ruled that '[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to

---

[3]    We note that trial counsel objected to this testimony at trial on the ground of relevance, but in this post-conviction appeal, the petitioner argues that trial counsel should have objected under Rule 404(b).

show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim.'" (alteration in *Gilley*) (quoting *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993)). Although Ms. Pope's statement that the victim asked her to remain on the telephone with her constituted hearsay, it was not so prejudicial as to change the outcome of the trial.

As to the petitioner's claim that trial counsel should have objected to the admission of the photographs of the victim taken at the crime scene, the petitioner has failed to establish that the trial court would have excluded the photographs had trial counsel objected. Photographs of a deceased victim showing the position of the body and the nature of the injuries are not necessarily unduly prejudicial simply because they are graphic or gruesome. *State v. Adams*, 405 S.W.3d 641, 658 (Tenn. 2013) ("Crime scene photographs of a victim tend to be prejudicial by nature, but this fact does not make them excludable per se." (citing *State v. Jordan*, 325 S.W.3d 1, 86 (Tenn. 2010)); *State v. Foust*, 482 S.W.3d 20, 48 (Tenn. Crim. App. 2015) ("Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and probative value is not [substantially] outweighed by their prejudicial effect." (alteration in *Foust*) (quoting *State v. Brock*, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009)); *see also, e.g.*, *State v. Willis*, 496 S.W.3d 653, 725-29 (concluding that the trial court did not abuse its discretion by admitting into evidence graphic and "quite disturbing" color photographs of the victim's decapitated head, severed hands, and "headless and handless body"). Photographs depicting a deceased victim can be probative of the "nature and extent of injuries," "the ferocity and the brutality of the attack," "the location and nature of the victims' wounds," and of the defendant's premeditation. *State v. Brian Cox*, No. 18, 1991 WL 35753, at *5 (Tenn. Crim. App., Jackson, Mar. 20, 1991) (citations omitted); *see also Willis*, 496 S.W.3d at 727 ("[T]he locations of the victims' bullet wounds . . . were relevant to the issue of premeditation, and photographs are clearly an aid."). Moreover, although the record before us contains only black and white copies of the color photographs admitted at trial, the photographs do not appear to be more graphic than those that are routinely admitted at murder trials.

Next, the petitioner argues that trial counsel performed deficiently by failing to call Agent Davis to testify to the contents of the agent's gunshot residue report. The petitioner has failed to show that he was prejudiced by counsel's failure to offer the report. Although the report states that "[e]lements of gunshot residue were absent" from a "[g]unshot residue kit" collected from the petitioner, the report does not indicate when or from what part of the petitioner's body the sample was collected. Because the petitioner failed to call Agent Davis at the evidentiary hearing, this evidence is absent from the record. Furthermore, the report qualifies the results of the defendant's test by stating, "It must be noted that some .22 rimfire ammunition does not have all the elements needed for gunshot residue analysis. These results cannot eliminate the possibility that the individual could

have fired, handled, or was near a gun when it fired." Because the report clearly cautions against the conclusion that the results foreclose the possibility of the petitioner's having fired a gun, the report is unlikely to have changed the outcome of the trial had it been admitted.

As to the petitioner's claim that trial counsel should have objected to the trial court's pressuring the jury to reach a verdict, the post-conviction court found that the trial judge asked the jury if they agreed with its plan to continue deliberations that night until they reached a verdict, and the record does not preponderate against that finding. The trial transcript reveals that, after the close of all evidence, the following exchange occurred:

> Ladies and gentlemen, let me tell you what I have decided we're gonna do today, and that's this - we're going to - all the proof is in. There won't be any more witnesses to testify. The attorneys will make their arguments. The State will go first, then the defendant can argue if they choose to do so, and then the State can close. After that, I will read my instructions to you and this will be your case for deliberations.
>
> My preference, tonight, is to go ahead and let's finish tonight; let you deliberate toward a verdict and go from there. Is that - We've ordered food for you and all that. You won't spend the night but you will stay here until you reach a verdict. Okay?
>
> (The jurors responds [sic] in the affirmative.)

The transcript indicates that the jury began their deliberations at 6:55 p.m. Because the trial court stated its plan for the jury to work past dinner time until they reached a verdict as a "preference" and asked the jury if they agreed, the court's statement did not constitute undue pressure on the jury. Consequently, the petitioner has failed to show that trial counsel performed deficiently by failing to challenge the trial court's handling of the matter.

Finally, as to the petitioner's assertion that trial counsel should have challenged the inclusion of A.B. on the jury because A.B. was biased against him, the post-conviction court found that the petitioner failed to establish the facts of this claim by clear and convincing evidence, and the record does not preponderate against that finding. Furthermore, the petitioner failed to call Juror A.B. at the evidentiary hearing, and, as such, the petitioner has failed to establish that he was prejudiced by counsel's failure to challenge A.B's inclusion on the jury. *See Gregory Gene Spiceland v. State*, No. M2014-01833-

-14-

CCA-R3-PC, 2015 WL 5908532, at \*5 (Tenn. Crim. App., Nashville, Oct. 9, 2015) ("The petitioner failed to present the juror at issue at the evidentiary hearing. As such, we cannot speculate whether the juror was actually prejudiced against the petitioner at trial." (citations omitted)). Consequently, this issue lacks merit.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE